FILED
US DISTRICT COURT
DISTRICT OF NEBRASKA

JAN 2 2 2015

OFFICE OF THE CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

IN THE MATTER OF:

Inspection of the workplace      Case No. 8:15 MJ 5
located at and near

807 State Street
Creighton, NE  68729-2904

under the control or custody of

LARGEN MANUFACTURING COMPANY

## APPLICATION FOR ADMINISTRATIVE SEARCH WARRANT UNDER THE OCCUPATIONAL SAFETY AND HEALTH ACT OF 1970

TO THE HONORABLE UNITED STATES MAGISTRATE JUDGE:

Alberto Alvarez, a duly authorized Compliance Officer
of the Omaha Area Office, Occupational Safety and Health
Administration, United States Department of Labor, hereby
applies for an administrative search warrant, pursuant to
section 8(a) of the Occupational Safety and Health Act of
1970, 29 U.S.C. §§ 651-678, hereinafter referred to as the
Act, for the inspection and search of the die-casting and
foundry operations located at 807 State Street, Creighton,
NE  68729-2904 and under the control and custody of Largen
Manufacturing Company.

1.    The authority for issuance of the administrative
search warrant is section 8(a) of the Act and Marshall v.
Barlow's, Inc., 436 U.S. 307, 98 S.Ct. 1816 (1978).

2.    Sections 8(a)(1) and 8(a)(2) of the Act
specifically authorize the Secretary of Labor to make

5AAY4000SJW

inspections and investigations at any reasonable time, at any plant, factory, establishment, construction site, or other area, workplace or environment where work is performed by an employee of an employer.

3.   On October 20, 2014, the Occupational Safety and Health Administration issued CPL 03-00-018, attached hereto as Exhibit A and incorporated herein, which established a National Emphasis Program for the programmed inspection of operations which may expose employees to the hazards of exposure to primary metals in accordance with the provisions of the Field Operations Manual (FOM) CPL 02-00-150, Chapter 2, attached hereto as Ex. B and incorporated herein, and by CPL 02-00-025, Scheduling System for Programmed Inspections, p. 4, paragraphs B.1.a.(1)(b), and pp. 11-12, B.1.b.(4), attached hereto as Ex. C and incorporated herein.

4.   As stated in CPL 03-00-018, a determination was made by the Occupational Safety and Health Administration that operations which involve exposures in primary metal industries should be targeted for inspection because of the potential for harmful chemical and physical health hazard exposures in foundries and establishments that manufacture nails, insulated wires and cables, steel piping, and copper and aluminum products.  Ex. A, p. 1 at para. I.

5.   In CPL 03-00-018 OSHA developed procedures for targeting establishments where there was a concern for occupational injuries from exposure to serious safety and health hazards found in Primary Metal Industries. The Primary Metal Industries are a group of establishments

2

engaged in the smelting and refining of both ferrous and
non-ferrous metals.  The metals are refined and then used in
manufacturing various products.  Ex. A, p. 3, para. X.A.

6.    Appendix B of CPL 03-00-018 contains a list of
SIC/NAICS codes from the Primary Metal Industries.
Businesses with SIC/NAICS codes 3312/324199, 331111, 331221;
3313/331112; 3316/331221; 3317/331210; 3321/331511;
3322/331511; 3325/331513; 3331/331411; 3334/331312;
3339/331419; 3341/331314, 331423, 331492; 3351/331421;
3354/331316; 3366/331525; 3365/331524; and 3369/331528 are
covered by this Instruction.  Ex. A Appendix B-1.

7.    Using the most recent Dunn and Bradstreet employer
listing for the industries identified in Appendix B, the
Office of Statistical Analysis (OSA) prepares a master list
of establishments based on a randomized table of
establishments within the Area Office's geographical
jurisdiction.  Ex. A, p. 4, para. XII.A.2.a.  Establishments
with fewer than ten employees are included in this NEP.  Ex.
A, p. 4, para. XII.A.2.c.  Area Offices may add to the
master list establishments when the office becomes aware of
a previously unknown manufacturing establishment within any
of the identified SIC/NAICS codes. Ex. A, p. 4, para.
XII.A.2.b.  The Area Office then applies deletion criteria.
The Area Office may delete establishments known to be out
of business.  Any establishment that has had an inspection
where worker exposures have been evaluated within the
previous two years, provided that no serious violations
related to chemical or noise exposures were cited, is

3

deleted from the list.   Ex. A, p. 5, para. XII.A.3.b.   The
establishment list shall be maintained by the Area Office
for a period of three years.   Ex. A, p. 5, para. XII.A.5.
Inspections under this NEP shall be scheduled in the order
the establishments appear on the master list, based on the
random numbers table.   Ex. A, p. 5, para. XII.A.4.

     8.   The Omaha Area Office received the master list of
establishments from the OSA and performed deletions.   The
Area Office then began their inspections, going down the
master list in order, in groups/cycles of five.   The Area
Office is currently on group/cycle 4.

     9.   Largen Manufacturing Company is an establishment
located within the jurisdiction of the Omaha Area Office.
Largen Manufacturing Company has a SIC code of 3365 and a
NAICS code of 331524, which is one of the SIC/NAICS codes
covered by this NEP.   Largen Manufacturing Company has fewer
than ten employees, but is subject to this NEP because
establishments with fewer than ten employees are to be
inspected. Ex. A, p. 4, para. XII.A.2.c.

     10.  Largen Manufacturing Company was an establishment
selected for inspection from the master list in group/cycle
2.   The Omaha Area Office carried over the inspection of
Largen Manufacturing Company due to a lack of available
resources to perform the inspection. Carryovers are allowed,
as provided in Ex. C, OSHA Instruction CPL 02-00-025, p. 6,
para. B.1.b.(1)(e). This establishment is located in
Creighton, Nebraska, which is more than 50 miles away from

the Omaha Area Office.  See Ex. C, p. 6, para.
B.1.b.(1)(e)1.c.

     11.  On November 20, 2014, Compliance Officer Alberto
Alvarez went to the establishment located at 807 State
Street, Creighton, NE  68729-2904, and requested permission
to make an inspection.  He was denied permission to do so by
Dan Largen, Owner.

     12.  It is requested that the warrant authorize an
inspection of the die-casting and foundry operations under
the custody and control of Largen Manufacturing Company,
including all relevant records, files, and papers.  The
inspection will be conducted during regular working hours or
at other reasonable times, within reasonable limits, and in
a reasonable manner, including the questioning privately of
any employee or agent, and the taking of photographs,
environmental samples, including the use of personal
sampling equipment, and measurements, when necessary.  The
Compliance Officer's credentials will be presented, and the
inspection and investigation will be commenced as soon as
practicable after the issuance of this warrant and will be
completed with reasonable promptness.  The inspection will
focus on the harmful chemical and physical health hazards
present in this facility in the Primary Metal Industries.
The Compliance Officer may expand the inspection beyond
those operations if other hazards or violations are observed
during the walk-around or documented in the OSHA 300 logs.

     13.  Any information, including photographs and
environmental samples, obtained in connection with the

5

inspection and which is designated to be a trade secret as defined in 18 U.S.C.A. § 1905, shall be considered confidential as provided in section 15 of the Act, 29 U.S.C.A. § 664.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _____1/22/15_____.

_____
Alberto Alvarez
Compliance Officer
Occupational Safety and Health
Administration
United States Department of Labor

Subscribed and sworn to before me in my presence on this ___22__ day of __January__, 2015.

_____
F. A. Gossett III
United States Magistrate Judge

6

Deborah R. Gilg
United States Attorney

_Laurie A. Kelly_
Laurie A. Kelly
Assistant U.S. Attorney
MA State Bar #557575
1620 Dodge Street
Suite 1400
Omaha, Nebraska 68102
Telephone No.:   (402) 661-3700
Fax:   (402) 661-3081
Email:  Laurie.kelly@usdoj.gov

OF COUNSEL:

M. Patricia Smith
Solicitor of Labor
Connecticut Bar #371708

Christine Z. Heri
Regional Solicitor
IL Bar #6204656

H. Alice Jacks
Associate Regional Solicitor
MO Bar #24482

Susan J. Willer
Attorney
OK Bar # 017798

Two Pershing Square Building
2300 Main Street, Suite 1020
Kansas City, MO 64108
(816) 285-7260
(816) 285-7287 (fax)

Attorneys for Thomas E. Perez
Secretary of Labor
United States Department of Labor

7

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA


IN THE MATTER OF:

Inspection of the construction
work site located at                    Case No. 8:15 MJ 5

807 State Street
Creighton, NE  68729-2904

under the control or custody of

LARGEN MANUFACTURING COMPANY


## ADMINISTRATIVE SEARCH WARRANT

TO:  Bonita Winingham
     Area Director
     Occupational Safety and Health
       Administration
     Omaha Area Office


Application having been made, which establishes that
the requested inspection is reasonable, based on a showing
that an operation with the potential to expose employees to
primary metals hazards located at 807 State Street,
Creighton, NE  68729-2904, under the control or custody of
Largen Manufacturing Company, was chosen for inspection on
the basis of a general administrative plan, derived from
neutral sources, for the enforcement of the Occupational
Safety and Health Act of 1970, 29 U.S.C. §§ 651-658,
hereinafter referred to as the Act

IT IS HEREBY ORDERED that, pursuant to section 8(a) of the Act, YOU OR YOUR DULY DESIGNATED REPRESENTATIVES ARE AUTHORIZED to enter the above-described workplace during regular working hours or at other reasonable times, and to make an inspection of the die-casting and foundry operations performed at the above located work site, in order to determine compliance with the Act, and the rules and regulations promulgated pursuant thereto.

Said inspection to include all relevant workplaces or environments where work potentially exposes employees to the harmful chemical and physical health hazards present in this facility in the Primary Metal Industries, and all pertinent conditions, structures, machines, apparatus, devices, equipment, materials, processes, controls, and facilities and all other things therein including videotaping, the taking of photographs, environmental samples including the use of personal sampling equipment, and measurements, and the examination and copying of all relevant records, files, and papers and other documents and to question privately any employee or agent, bearing on whether employees are being furnished employment and place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to employees, and whether there is compliance with the occupational safety and health standards promulgated under the Act.

2

You are hereby directed not to disclose any information obtained during the inspection which is designated to be a trade secret as defined by 18 U.S.C. § 1905, except that such information may be disclosed to other officers or employees concerned with carrying out the Act or when relevant in any proceeding under the Act.

A return shall be made to this Court showing that the inspection has been completed. The inspection authorized herein shall be initiated within _____ /0 days, and a return shall be made to the Court within fourteen days following completion of the inspection.

DATED: _____ 1/22/15 _____

_____
F. A. Gossett III
United States Magistrate Judge

3

RETURN OF SERVICE

I hereby certify that a copy of the within warrant was duly served on _____, to the company named herein:

_____

_____

_____

RETURN

I declare under penalty of perjury that the inspection of the workplace described in this warrant was made on _____.

Date:_____    By: _____
                              Compliance Officer, Occupational
                              Safety and Health Administration
                              United States Department of Labor

4



**U.S. DEPARTMENT OF LABOR**          **Occupational Safety and Health Administration**

| DIRECTIVE NUMBER: CPL 03-00-018 | EFFECTIVE DATE: 10/20/2014 |
|---|---|
| SUBJECT: National Emphasis Program - Primary Metal Industries | |

## ABSTRACT

**Purpose:**     This Instruction describes policies and procedures for implementing a National Emphasis Program to identify and reduce or eliminate worker exposures to harmful chemical and physical health hazards in facilities in the Primary Metal Industries.

**Scope:**      This Instruction applies OSHA-wide.

**References:**     OSHA Instruction CPL 02-00-150, April 22, 2011, Field Operations Manual (FOM).

OSHA Notice 14-01 (CPL 02), March 6, 2014, Site-Specific Targeting 2014 (SST-14).

OSHA Instruction CPL 02-02-038 (CPL 2-2.38D), March 20, 1998, Inspection Procedures for the Hazard Communication Standard.

OSHA Instruction CPL 02-00-158, June 26, 2014, Inspection Procedures for the Respiratory Protection Standard.

OSHA Instruction CPL 02-00-025 (CPL 2.25I), January 4, 1995, Scheduling System for Programmed Inspections.

OSHA Instruction CPL 03-00-007, January 24, 2008, National Emphasis Program – Crystalline Silica.

OSHA Instruction CPL 03-00-009, August 14, 2008, National Emphasis Program – Lead.

Federal Register, Vol. 77, No. 58, pages 17574-17896, March 26, 2012, Hazard Communication. Final Rule. [HCS 2012]

**Cancellations:**     None.

i

EXHIBIT A

**State Impact:**      Notice of Intent and Adoption Required.

**Action Offices:**    OSHA National, Regional and Area Offices, State Plan and State Consultation Offices

**Originating Office:**  Office of Health Enforcement

**Contact:**          Directorate of Enforcement Programs
Office of Health Enforcement, N-3119
200 Constitution Avenue, NW
Washington, DC 20210
202-693-2190

By and Under the Authority of

David Michaels, PhD, MPH
Assistant Secretary

i

## Executive Summary

OSHA inspection history has shown that individuals employed in the *Primary Metal Industries* are exposed to serious safety and health hazards on a daily basis. Previous inspections of primary metal establishments have resulted in citations for overexposures to a wide variety of health hazards including chemical exposures in foundry operations as well as physical stressors such as noise and heat. This Instruction describes policies and procedures for implementing a National Emphasis Program (NEP) to identify and reduce or eliminate worker exposures in facilities under the *Primary Metal Industries*, such as iron foundries and establishments that manufacture nails, insulated wires and cables, steel piping, and copper and aluminum products. This NEP will also heighten health and safety awareness within the affected industries of the potential for worker exposure to harmful chemical and physical hazards so that employers may voluntarily take steps to correct hazards and comply with current safety and health regulations and practices.

## Significant Changes

This Instruction describes a new initiative by the Occupational Safety and Health Administration.

From May 19, 2011, until September 30, 2014, this was a three-year NEP with required inspection goals. As of October 1, 2014, this Instruction will discontinue the required programmed inspection goals, but it will retain the NEP's inspection procedures, citation guidance, and outreach information for continued reference by Regional and Area Offices as a way to assure that inspections conducted under this Instruction continue to address the health-related hazards in these industries.

Minor changes as of FY 2015:

- Minor revisions to allow Area Offices to determine the number of inspections at their discretion and to delete the NEP expiration date.

- Minor revisions resulting from the HCS 2012 (Hazard Communication, Final Rule, Federal Register, Vol. 77, No. 58, March 26, 2012).

- Minor changes to updated references, such as revised OSHA directives, the new OSHA Information System (OIS), and the North American Industry Classification System (NAICS).

## Table of Contents

I.      Purpose ...................................................................................................................................1

II.     Scope ......................................................................................................................................1

III.    References .............................................................................................................................1

IV.     Cancellations ........................................................................................................................1

V.      Action Offices ......................................................................................................................1

VI.     Federal Program Change ....................................................................................................2

VII.    Expiration .............................................................................................................................2

VIII.   Significant Changes .............................................................................................................2

IX.     Application ...........................................................................................................................3

X.      Background ...........................................................................................................................3

XI.     National Emphasis Program Goals ...................................................................................3

XII.    Program Procedures ...........................................................................................................4

XIII.   Outreach ...............................................................................................................................6

XIV.    Inspection Procedures ........................................................................................................7

XV.     Consultation .......................................................................................................................16

Appendix A - Chemical Exposure Hazards Found in Primary Metal Industries ....................... A-1

Appendix B - Primary Metal Industries - SIC/NAICS Codes .....................................................B-1

i

I.    Purpose.  This Instruction describes policies and procedures for implementing a National Emphasis Program (NEP) to identify and reduce or eliminate worker exposures in facilities in the *Primary Metal Industries*, such as iron foundries and establishments that manufacture nails, insulated wires and cables, steel piping, and copper and aluminum products, under Major Group 33 in the Standard Industrial Classification (SIC) Manual, and now under the North American Industry Classification System (NAICS). This NEP will also heighten health and safety awareness within the affected industries of the potential for worker exposure to harmful chemical and physical health hazards so that employers may voluntarily take steps to correct hazards and comply with the applicable safety and health standards.

II.   Scope.  This Instruction applies OSHA-wide.

III.  References.

A.    OSHA Instruction CPL 02-00-150, April 22, 2011, Field Operations Manual (FOM).

B.    OSHA Notice 14-01 (CPL 02), March 6, 2014, Site-Specific Targeting 2014 (SST 14).

C.    OSHA Instruction CPL 02-02-038 (CPL 2-2.38D), March 20, 1998, Inspection Procedures for the Hazard Communication Standard.

D.    OSHA Instruction CPL 02-00-158, June 26, 2014, Inspection Procedures for the Respiratory Protection Standard.

E.    OSHA Instruction CPL 02-00-025 (CPL 2.251), January 4, 1995, Scheduling System for Programmed Inspections.

F.    OSHA Instruction CPL 03-00-007, January 24, 2008, National Emphasis Program – Crystalline Silica.

G.    OSHA Instruction CPL 03-00-009, August 14, 2008, National Emphasis Program – Lead.

H.    Federal Register, Vol. 77, No. 58, pages 17574-17896, March 26, 2012, Hazard Communication, Final Rule. [HCS 2012]

IV.   Cancellations.  None.

V.    Action Offices.

A.    Responsible Office.  Directorate of Enforcement Programs, Office of Health Enforcement.

B.    Action Offices.  National, Regional and Area Offices; Consultation Project

1

Managers.

C.     Information Offices. OSHA National Offices.

VI.     Federal Program Change. Notice of Intent and Adoption Required. This Instruction describes a Federal program change which establishes a new National Emphasis Program (NEP) to identify and reduce or eliminate worker exposures in the primary metal manufacturing facilities under Major Group 33 in the Standard Industrial Classification (SIC) Manual and now under the NAICS. The NEP targeted industries comprise sixteen (16) different SICs in the 33XX metals manufacturing sector, corresponding to 17 different NAICS codes in the 331XXX sector, plus 324199 (coke ovens), as listed in Appendix B. OSHA inspection history indicates that individuals employed in the Primary Metal Industries (smelting and refining of ferrous and nonferrous metals) are exposed to serious safety and health hazards on a daily basis including chemical exposures as well as physical stressors such as noise and heat. Because the seriousness and prevalence of this problem is nationwide, States must participate in this national emphasis effort. The Office of Statistical Analysis will provide each State a list of establishments as set out in paragraph XII.A.2, upon request.

The State's notice of intent must indicate whether the State's emphasis program will be identical to or different from the Federal program. If the State's program differs from the Federal one, its implementing policies and procedures must be at least as effective as those in this instruction and must be available for review. The State may either post its different emphasis program on its State plan website and provide the link to OSHA or provide an electronic copy to OSHA with information on how the public may obtain a copy. If the State's emphasis program is identical to the Federal program, it must provide the date of adoption to OSHA. OSHA will provide summary information on the State responses to this instruction on its Web site. States must code inspections conducted under this NEP in accordance with paragraph XIV.I of this Instruction.

VII.     Expiration. There is no expiration date.

VIII.     Significant Changes. This is a new program. From May 19, 2011, until September 30, 2014, this was a three-year NEP with required inspection goals. As of October 1, 2014, this Instruction will discontinue the required programmed inspection goals, but it will retain the NEP's inspection procedures, citation guidance, and outreach information for continued reference. Minor changes, as of fiscal year (FY) 2015, include:

A.     Minor revisions to allow Area Offices to determine the number of inspections at their discretion and to delete the NEP expiration date.

B.     Minor revisions resulting from the HCS 2012 (Hazard Communication, Final Rule, Federal Register, Vol. 77, No. 58, March 26, 2012).

C.     Minor changes to updated references, such as revised OSHA directives, the new OSHA Information System (OIS), and the NAICS.

2

IX.   Application. This Instruction applies to all primary metal manufacturing facilities under the SIC/NAICS codes listed in Appendix B.

X.   Background.

A.   The Primary Metal Industries were identified as a concern during a review of data from the Bureau of Labor Statistics' Census of Fatal Occupational Injuries. The BLS report also showed that five of the top 20 industries with non-fatal occupational injury and illness cases were within these SIC/NAICS codes. The Department of Health information from one state regarding elevated blood lead levels also indicated that the Primary Metal Industries accounted for 26% of the establishments having at least one worker with blood lead levels of 30 µg/100g of whole blood or greater in 2005.

OSHA inspection history indicates that individuals employed in the Primary Metal Industries are exposed to serious safety and health hazards on a daily basis. Previous inspections of primary metal establishments have resulted in citations for overexposures to a wide variety of health hazards including chemical exposures as well as physical stressors such as noise and heat. Chemical exposures found in these facilities include carbon monoxide, lead, silica, metal dusts and fumes, and various other chemical substances. A more extensive list is provided in Appendix A.

The Primary Metal Industries are a group of establishments engaged in the smelting and refining of both ferrous and nonferrous metals. These metals are refined from ore, pig and scrap, during rolling, drawing, casting and alloying metal operations. Some of the products they manufacture include nails, spikes, insulated wires and cables, steel piping, sheets and bars, copper and aluminum products, and coke. These SIC/NAICS codes are listed in Appendix B.

XI.   National Emphasis Program Goals.

A.   To minimize and/or eliminate worker exposure to the hazards, both physical and chemical, which are known to be present in the primary metal industries. Reduction and/or elimination of chemical exposures will help to reduce and prevent the occurrence of skin and eye injuries as well as occupational lung injury and other illnesses. Reduction of worker exposures to physical hazards will help prevent adverse effects such as hearing loss.

B.   To significantly reduce/eliminate worker overexposures to both chemical and physical stressors and, therefore, control the health hazards associated with such exposures. This goal will be accomplished by a combined effort of inspection targeting, outreach to employers, and compliance assistance.

C.   Inspections will be directed to those facilities known to manufacture primary

3

metals and metal products.

D.    To ensure abatement and measure the effectiveness of this NEP, follow-up site
      visits often will be necessary where overexposures have been documented.

XII.    Program Procedures.

    A.    Site Selection.

        1.    Targeting Sources.

            a.    Inspections conducted under this NEP shall focus on facilities with
                    workers in Major Group 33 of the SIC Manual, and now identified
                    by their corresponding NAICS codes in Appendix B.

            b.    When performing programmed inspections under this NEP, each
                    Area Office, in conjunction with the Regional Office, shall develop
                    an inspection master list of establishments in accordance with
                    OSHA Instruction CPL 02-00-025, Scheduling System for
                    Programmed Inspections.

        2.    Master List Generation.

            a.    Upon request, using the most recently available Dunn and
                    Bradstreet employer list, the Office of Statistical Analysis (OSA)
                    will prepare a list based on a random number table (RNT) (see
                    CPL 02-00-025) of establishments in the SIC/NAICS codes
                    mentioned in Appendix B. Each establishment on the resulting
                    establishment list will be assigned a sequential number, starting at
                    the top of the list with number one. OSA will then provide to each
                    Area Office a list of establishments in these SIC/NAICS codes
                    within the Area Office's geographical jurisdiction.

            b.    Whenever an office becomes aware of a previously unknown
                    manufacturing establishment within any of the identified
                    SIC/NAICS codes, the establishment shall be added to the list.

            c.    Establishments with fewer than ten employees shall also be
                    included in this NEP.

        3.    Deletions.

            a.    Based on their familiarity with local industries, Regional and Area
                    offices shall delete from the master list any firms known to be out
                    of business.

b.   The Regional and Area Offices shall also delete any establishment that has had an inspection where worker exposures have been evaluated within the previous two (2) years, provided either that no serious violations related to chemical or noise exposures were cited or that serious violations were cited but a follow-up inspection documented effective abatement of the cited conditions.

4.   When performing programmed inspections under this NEP, each Area Office shall conduct inspections from the list of establishments in the SICs/NAICS codes contained in Appendix B. Inspections shall be scheduled in the order called for by the random number table.

5.   The establishment list generated under this NEP shall be maintained in the Regional/Area Offices for a period of three years. (See OSHA Instruction ADM 03-01-005, OSHA Compliance Records.)

B.   Complaints and Referrals.

Complaint or referral inspections alleging worker exposure to any other hazards at facilities in these SICs/NAICS codes may be expanded to address the issues covered under this NEP. For further guidance, CSHOs should refer to CPL 02-00-150, Field Operations Manual (FOM).

C.   Programmed Inspections.

As of October 1, 2014, this Instruction will discontinue the required programmed inspection goals, but it will retain the NEP's inspection procedures, citation guidance, and outreach information for continued reference.

Some establishments may be selected for inspection under the current SST plan or also under one or more other OSHA enforcement initiatives (National Emphasis (NEP) or Local Emphasis (LEP) Programs). This NEP, which is based on exposure hazards in the Primary Metal Industries, shall be run **concurrently** with the SST plans.

Whenever an establishment is scheduled for inspection on the current cycles of both the NEP plan and the current SST program plan, the inspections may be scheduled at the same time. CSHOs shall use all IMIS/OIS codes applicable for the inspection. The employer's DUNS number shall also be recorded for each inspection.

In cases where an establishment has been scheduled for inspection under both the SST Plan and this NEP, an inspection limited in scope to the health issues targeted by the NEP shall be conducted even if all CSHO-calculated Days Away, Restricted, or Transferred (DART) rates for the establishment are found to be below the current SST Plan inspection thresholds. Other NEPs and/or LEPs may

5

also run concurrently with this NEP.

D.   Expanding Scope of Inspection.

Inspections under this NEP shall normally be limited to evaluating worker exposure to physical and chemical hazards described in this Instruction. However, a CSHO may expand the scope of the inspection if other safety and health hazards or violations are observed and/or brought to their attention. The CSHO shall follow the guidelines in the FOM when expanding the scope of any inspection.

XIII.   Outreach.

A.   Each Area Office/Region is encouraged to develop outreach programs that will support their enforcement efforts. Suggested outreach activities are as follows:

1.   Letters, news releases by local and national news organizations, and trade magazines can assist with disseminating information about this NEP.

2.   Local hospitals, occupational health clinics, and local occupational physicians should be alerted via mail about occupational exposure to lead, silica and other hazards associated with them, if they have not been contacted previously.

3.   Compliance Assistance Specialists (CAS) should conduct outreach activities such as seminars/informational sessions for the health care sector and employer groups, as well as worker groups (this would include national and local unions).

OSHA's compliance assistance resources for this industry include:

a.   Respiratory Protection eTool and Safety and Health Topics Page

b.   Personal Protective Equipment Safety and Health Topics Page

c.   Noise and Hearing Conservation eTool and Safety and Health Topics Page

d.   Heat Stress Safety and Health Topics Page
e.   Silica eTool and Safety and Health Topics Page

f.   Hazard Communication Safety and Health Topics page

g.   Secondary Lead Smelter eTool

h.   Lead Safety and Health Topics Page

6

4.     Area Offices should attempt to establish Partnerships and Alliances with groups representing employers and workers in the Primary Metal Industries to share successes and technical information concerning effective means of controlling and reducing worker exposures.

5.     Small businesses should contact OSHA's On-Site Consultation Program. OSHA's On-Site Consultation Service offers free and confidential advice to small and medium-sized businesses in all States across the country, with priority given to high-hazard worksites. On-site Consultation services are separate from enforcement and do not result in penalties or citations. Consultants from state agencies or universities work with employers to identify workplace hazards, provide advice on compliance with OSHA standards, and assist in establishing safety and health management systems. Additional information about the On-Site Consultation Program can be found on the web at www.osha.gov/dscp/smallbusiness/consult.html.

## XIV.   Inspection Procedures.

This section outlines procedures for conducting inspections and preparing citations for hazards related to worker exposures. For further guidance, CSHOs should consult the OSHA directives, appendices, and other references provided below.

A.     Opening Conference.

1.     During the opening conference, the CSHO shall initially confirm that the employer falls under the SIC/NAICS classification of a primary metal industry. If the SIC/NAICS code of the establishment is not included in Appendix B, the CSHO will exit the facility (if there is no other reason to inspect the employer) and no inspection shall be conducted under this NEP.

2.     CSHOs should explain the goals of this NEP to the employer.

3.     CSHOs should request information on any hazard analyses performed at the facility for the following:

a.     29 CFR 1910.132(d) Hazard assessment and equipment selection: OSHA's Personal Protective Equipment (PPE) standards require employers to assess their workplaces to determine if hazards are present, or are likely to be present, that necessitate the use of PPE (29 CFR §1910.132). If such hazards are present or are likely to be present (as determined by the information from Material Safety Data Sheets (MSDSs) or Safety Data Sheets (SDSs) or observable workplace conditions), employers must ensure that workers use the appropriate PPE to protect their eyes, face, hands and extremities,

7

depending on the nature of the hazard (29 CFR §§1910.132, .133, .138). The employer is responsible for both the quality of the hazard assessment and the adequacy of the PPE selected.

b.   29 CFR 1910.134(d) Selection of Respirators: Employers in the primary metal industries with potential respiratory hazards are required to conduct the evaluation required by §1910.134(d)(1)(iii) of the Respiratory Protection standard.

The hazard evaluation requirement is performance-oriented, and a variety of estimation techniques may be used to characterize worker exposures, depending upon the nature of the chemical products, processes, operating environment, and other factors.

Where a substance is used that may pose a respiratory hazard (see MSDSs/SDSs for chemical substance in use), the employer must assess the nature and magnitude of the hazard relative to the conditions of use in its workplace, considering both normal operating conditions and reasonably foreseeable emergencies.

c.   29 CFR 1910.1200(d) Hazard classification: OSHA's Hazard Communication standard requires that employers who choose not to rely on the classification of a hazardous chemical performed by a chemical manufacturer or importer, must conduct their own evaluation to classify the chemical in accord with §1910.1200(d)(2), and consider the available scientific evidence concerning that chemical. Otherwise, employers can rely on information from the MSDS/SDS.

B.   Walkaround and Records Review.

1.   MSDS/SDS. CSHOs should review the MSDSs/SDSs for chemicals used and/or manufactured at the facility to ensure they are in compliance with the requirements of 29 CFR 1910.1200(g). If any deficiency is found for any chemicals not manufactured at the workplace, referrals should be made to the appropriate Area Office in whose jurisdiction the manufacturer or upstream supplier is located pursuant to OSHA Instruction CPL 02-02-038 (CPL 2-2.38D) - Inspection Procedures for the Hazard Communication Standard.

2.   Injury/Illness Records. CSHOs should review the employer's injury and illness records to identify any workers with recorded illnesses or symptoms associated with exposure to chemical or physical hazards. CSHOs should investigate log entries for any type of respiratory issues, hearing loss, or other evidence of adverse health effects. Skin or eye injuries involving chemicals should also be investigated.

8

3.    Medical Access Orders. Based on information obtained from illness/injury records and interviews, CSHOs may need to review additional worker medical information. When accessing worker medical information, CSHOs should follow the procedures in 29 CFR 1913.10 and obtain a written medical access order. CSHOs may also consider obtaining specific written consent from a worker pursuant to 29 CFR 1910.1020(e)(2)(ii), and should ensure that the agency or agency worker is listed on the consent form as the designated representative to receive the information.

4.    Production Process Evaluation. CSHOs should request and review the employer's production and processing records.

    a.    Document the types and quantities of chemicals used, what processes are involved, and the frequency of use.

    b.    Evaluate and document the extent of engineering controls relative to the processes, the work practices implemented, and any protective equipment used during these operations.

        Primary means for controlling exposures include local exhaust ventilation to remove contaminants at their source, enclosing production processes or exposure sources, isolation of the processes or exposure sources, substitution of less hazardous materials and general dilution ventilation.

    c.    Evaluate workers' respirator usage, if any, and request a copy of the employer's respiratory protection program.

    d.    Evaluate personal air and noise monitoring records conducted by the employer.

5.    Exposure Monitoring. CSHOs shall normally conduct full-shift personal air monitoring and/or short-term personal air monitoring as appropriate. For some chemicals, monitoring to assess short-term exposure limits (STELs), ceiling (C) or OSHA Permissible Exposure Limits (PELs) may be necessary. If the employer has conducted representative sampling in the previous six months, which shows no overexposures for all processes that have a potential for worker exposures, and any changes in the process are not likely to have increased exposures, the CSHO shall do screening sampling of the work operation(s) with the highest potential exposures to determine if additional sampling is necessary. When reviewing the employer's sampling, ensure that all job functions and the heaviest production shifts have been evaluated.

    a.    CSHOs shall use the available MSDSs/SDSs, production and

9

process information in determining whether additional monitoring for other chemicals should be performed.

b.   Significant concentrations of airborne contaminants may be encountered in many operations in the primary metal industries. Processes that should be evaluated include but are not limited to: handling of scrap, the smelting process, the treatment and inoculation of molten metal before pouring, core- and mold-making processes, pouring molten metal, cooling of casts, casting knockout, casting finishing operations, and the clean-out and re-lining of furnaces.

6.   CSHO Protection.

CSHOs conducting these inspections should have some training or experience in the primary metal industry. CSHOs must don the appropriate PPE before entering any hazardous areas. Hard hat, safety shoes, safety glasses (or goggles), and hearing protection will usually be required when inspecting any of these areas.

CSHOs must remain at least twenty feet from melting and pouring operations.

When inspecting melting and pouring operations, CSHOs should avoid the use of urethane foam earplugs, which may be combustible.

CSHOs shall wear long sleeve cotton shirts and long pants. They should not wear polyester, nylon or other manmade fabrics that can melt or readily ignite. Fire-resistant clothing is encouraged. In most foundry areas, long sleeve cotton coveralls which have no outside pockets or cuffs should be worn. Pant legs must cover the top of the boot edge.

CSHOs are not anticipated to be handling chemicals in foundries; however, the presence of airborne gases, fumes, and caustics, which may cause dermal irritation require the use of gloves. Leather gloves are mildly chemical resistant and heat tolerant. Where chemical exposures are found to be higher than average, treated leather or Kevlar gloves should be worn. Sleeves must cover the cuff of the glove. CSHOs should not tuck sleeves into the cuffs of the gloves. When the arm is fully extended, the cuff of the glove and sleeve must not allow bare skin to be exposed.

Impact and chemical-resistant goggles are appropriate for these industries. Safety glasses with side shields are not recommended in the presence of and potential exposure to caustics, corrosives, dusts and acid. Impact resistance is required since the industry has the potential for flying and falling debris. Where molten ferrous metal operations must be viewed for

10

a significant length of time, #3-#5 green goggles (or #3-#5 safety glasses under goggles) should be worn.

Respiratory protection may also be required in many work areas. A list of potential contaminants is found in Appendix A. When in the vicinity of operations where the presence of silica is known or suspected, CSHOs shall wear a half-mask or full face respirator equipped with N100 cartridge(s). If other respiratory hazards exist, CSHOs shall wear the appropriate combination cartridge.

CSHOs should discuss the need for further PPE with their Team Leader or Area Director.

C.   Citation Guidance.

1.   OSHA PELs.

Where exposures are in excess of the permissible exposure limits (PELs), ceiling limits (C) or STELs, for substances listed in Tables Z-1, Z-2, or Z-3 of 29 CFR 1910.1000, cite the applicable sections of 29 CFR 1910.1000.

2.   Engineering and Work Practice Controls.

If an employer has failed to implement administrative, engineering or work practice controls where feasible for reducing exposures to levels below the PEL, the CSHO shall usually cite 1910.1000(e), or the appropriate engineering control section of the substance-specific standard.

3.   Respirator Standard.

a.   If there are respiratory hazards present at the work site and employers have failed to conduct the initial respiratory hazard evaluation, cite 29 CFR 1910.134(d)(1)(iii).

b.   Where workers are required to use respirators, but the employer has failed to comply with a requirement in the respirator standard, cite the applicable sections of 29 CFR 1910.134.
   • Inspection and citation guidance are provided in CPL 02-00-158, Inspection Procedures for the Respiratory Protection Standard.

4.   Personal Protective Equipment (PPE) Standards.

Pursuant to §1910.132(d), the employer must conduct a hazard assessment to determine if hazards are likely to be present that necessitate the use of PPE and have a written certification that the assessment was conducted.

11

Where chemicals having irritant properties are present, PPE is not being used or is inadequate, and workers' eyes and/or skin are potentially exposed to such chemicals, cite the applicable PPE standard (29 CFR §§1910.132, .133, .138).

   a.   Chemical goggles or other appropriate eye protection must be used when there is a potential for splash or vapor exposure to a substance that is likely to cause injury to the eye.

   b.   Chemical-resistant gloves, or sleeves or other appropriate protection for exposed skin must be used when handling liquid, paste, or powdered substances that could cause dermal injury. CSHOs should consult the MSDS/SDS for the appropriate type of gloves and/or the glove chart in OSHA PPE Publication 3151-12R, 2003.

   c.   The employer must also provide training for exposed workers as indicated in 29 CFR 1910.132. This training must include information on when and how to use appropriate PPE.

   d.   In addition, employers must provide information on the value, limitations and maintenance of this equipment in accordance with 29 CFR §§1910.132 and .134.

5.   <u>Occupational Noise Standard.</u>

   a.   At levels at or above an 8-hour time-weighted-average (TWA) of 85 dBA, an effective hearing conservation program must be implemented. The program must be evaluated for completeness and effectiveness of implementation.

   b.   Where noise levels are above the 90 dBA TWA, hearing protection must be worn by all exposed workers until engineering or administrative controls reduce exposures to below the PEL. Workers who have already experienced a standard threshold shift must wear hearing protection at levels at or above 85 dBA TWA. Cite the applicable paragraph under 1910.95(i)(2).

   c.   When hearing protection is required, employers must make a variety of hearing protectors available at no cost to the workers.

6.   <u>Expanded Health Standards.</u> Compliance with the elements of the expanded health standards shall be evaluated, if exposures are found to chemicals, such as Lead, §1910.1025, or Cadmium, §1910.1027.

D.   <u>Other Applicable Requirements.</u>

12

3.    <u>Access to Employee Exposure and Medical Records.</u>

        a.    Interview workers to determine whether they were informed of their right to review their medical and exposure records annually and understand their rights regarding the confidentiality of such records.

        b.    Review the employer's recordkeeping program to ensure that the required information is being collected and reported.

        c.    Evaluate the employer's method for ensuring the confidentiality of worker medical records.

        d.    When it is necessary to review worker medical records, ensure that they are obtained and remain confidential in accordance with §1913.10 and §1910.1020.

               Citation Guidance:  If violations are found, CSHOs should cite the applicable section of §1910.1020.  These rules do not require the creation of any records, only preservation and access requirements.

               Recent revisions to recordkeeping policies and procedures are described in CPL 02-00-135, Recordkeeping Policies and Procedures Manual.

4.    <u>Heat Stress.</u>

        Engineering, administrative and work practice controls should be evaluated in areas where there is a potential for heat stress (e.g., furnaces) and/or when cases of heat stress are recorded on the OSHA 300. Investigation guidelines and other information can be found in the OSHA Technical Manual, Section III, Chapter 4, Heat Stress.

E.    <u>Follow-up Inspections.</u>

    Where citations are issued for overexposures, or abatement documentation provided by the employer for other serious citations is not adequate, follow-up site visits shall be conducted to determine whether the employer is eliminating exposures or reducing exposures below the PEL.  Where exposures could not feasibly be reduced below the PEL, engineering and administrative controls must still have been implemented to reduce exposures to the extent feasible, and workers provided with adequate respiratory protection and other appropriate PPE where necessary.

F.    <u>Program Evaluation.</u>

    This NEP will be evaluated using data collected from case files and follow-up site visit reports submitted by each Area Office to the Regional Offices.  The data will

be evaluated to determine the impact of OSHA inspections on the reduction of exposures at each work site. Each Region shall designate an individual who will work with the Office of Health Enforcement.

G.   Coordination.

    1.   National Office. This NEP will be coordinated by the Directorate of Enforcement Programs (DEP) - Office of Health Enforcement (OHE). All questions and comments should be directed to the Office of Health Enforcement. OHE will coordinate with the Directorate of Technical Support and Emergency Management (DTSEM), Office of Occupational Medicine (OOM) and other offices for assistance as needed.

    2.   Regional Office. Each Regional Administrator is required to identify a coordinator for this NEP.

H.   Federal Agencies. Executive Order 12196, Section 1-201, and 29 CFR 1960.16 require Federal Agencies to follow the enforcement policy and procedures contained in this Directive.

I.   IMIS/OIS Coding Instructions. The instruction below is for recording inspections under this NEP. The majority of inspections conducted under this NEP will be "Health" inspections and should be coded as such. When this NEP is conducted in conjunction with an SST inspection, the OSHA-1 Forms shall be marked as "programmed planned" in item 24, and in item 21, Inspection Category shall be recorded as "H". In addition, the "NEP" value of "SSTARG__" shall be recorded in Item 25d along with the NEP code "PMETALS".

If during an SST inspection (or other safety-related inspections) it is determined the SIC should be one of the 3300 SICs, the NEP code for "PMETALS" shall be recorded.

This new "PMETALS" code applies to the following enforcement forms: OSHA-1, OSHA-7, OSHA-36, OSHA-90 and OSHA-55 (and the corresponding OIS pages/tabs).

Whenever a consultation visit is made in response to this NEP, Consultation request/visit forms are to be completed with the NEP code "PMETALS" in item 25 on Form-20, and in item 28 on Form-30 (and the corresponding OIS pages/tabs).

XV.   Consultation. Regional and Area Offices are encouraged to work with their State OSHA Consultation Office to communicate the goals of this NEP. When appropriate, 21(d) Consultation Projects are encouraged to develop and conduct their own outreach activities to address exposures to physical and chemical hazards.

15

## Appendix A
## Chemical Exposure Hazards Found in Primary Metal Industries

acrolein
ammonia
antimony
arsenic
asbestos
benzene
2-butoxyethanol
carbon dioxide
carbon monoxide
chlorine
chromium
coal tar pitch volatiles
copper fume
dimethylamine
dimethyl ethylamine
formaldehyde
furfuryl alcohol
hydrogen chloride
hydrogen sulfide
iron oxide
isocyanates
isopropyl alcohol
lead
methane
methyl alcohol
methyl formate
methylene bisphenyl isocyanate
molybdenum
naphthalene

nitric acid
nitrogen
nuisance dust
ozone
phenol
polycyclic aromatic hydrocarbons
propane
silica
sulfuric acid
sulfur dioxide
tetraethyl lead
toluene
vanadium
wood dust
xylene
zinc oxide

metal dusts including:
  iron
  aluminum
  manganese
  beryllium
  cadmium
  tin
  copper
  silver
  nickel
  lead

A-1

Appendix B
Primary Metal Industries - SIC/NAICS Codes

The Primary Metal Industries (PMI) are a group of establishments engaged in the smelting and refining of both ferrous and nonferrous metals. These metals are refined from ore, pig, and scrap, during rolling, drawing, casting, and alloying metal operations. Some of the products they manufacture include nails, spikes, insulated wires and cables, steel piping, sheets and bars, copper and aluminum products, and coke. These SIC/NAICS codes include:

    3312 – Steel Works, Blast Furnaces (including Coke Ovens), and Rolling Mills
        (NAICS 324199, 331111, 331221)
    3313 – Electrometallurgical Products Except Steel
        (NAICS 331112)
    3316 - Cold-Rolled Steel Sheet, Strip and Bars
        (NAICS 331221)
    3317 - Steel Pipe and Tubes
        (NAICS 331210)
    3321 - Gray and Ductile Iron Foundries
        (NAICS 331511)
    3322 – Malleable Iron Foundries
        (NAICS 331511)
    3325 – Steel Foundries, Not Elsewhere Classified
        (NAICS 331513)
    3331 – Primary Smelting and Refining of Copper
        (NAICS 331411)
    3334 – Primary Production of Aluminum
        (NAICS 331312)
    3339 – Primary Smelting and Refining of Nonferrous Metals, Except Copper and
        Aluminum (NAICS 331419)
    3341 – Secondary Smelting and Refining of Nonferrous Metals
        (NAICS 331314, 331423, 331492)
    3351 – Rolling, Drawing and Extruding of Copper
        (NAICS 331421)
    3354 – Aluminum Extruded Products
        (NAICS 331316)
    3366 – Copper Foundries
        (NAICS 331525)
    3365 – Aluminum Foundries
        (NAICS 331524)
    3369 – Nonferrous Foundries Except Aluminum and Copper
        (NAICS 331528)

1.   Hazard Communication.

   a.   Workers who may be exposed to chemicals are required to be trained on the hazards of the chemicals in the workplace pursuant to 29 CFR 1910.1200(h)(3).

   b.   Workers must be informed of the signs and symptoms of any respiratory, skin or eye conditions associated with exposures to hazardous chemicals in the workplace.

   c.   Employers must ensure that all MSDSs/SDSs are readily accessible to workers. CSHOs should ensure that all containers are labeled with the appropriate hazard warnings.

   Citation Guidance: Detailed inspection and citation guidance, including guidance on how to address inadequate MSDSs/SDSs, is contained in OSHA Instruction CPL 02-02-038 (CPL 2-2.38D)- Inspection Procedures for the Hazard Communication Standard.

   Note: CPL 02-02-038 will soon be revised because of the recent Final Rule for Hazard Communication (77 Fed. Reg. 17574-17896, March 26, 2012), i.e., HCS 2012. Until then, CSHOs shall note the employer's compliance with the effective dates of applicable provisions in the HSC 2012, listed in paragraph 1910.1200(j). For specific guidance, contact the Office of Health Enforcement.

2.   Housekeeping and Hygiene Practices.

   a.   Determine whether the employer's housekeeping and hygiene practices may contribute to overexposure. For example:

   - Exposed surfaces should be as free as practicable of hazardous dusts, such as lead and chromium (bulk samples of the dust may need to be collected).

   - Contaminated surfaces should not be blown clean with compressed air or other forced air (such as leaf blowers).

   - If vacuuming is used for cleaning, the exhaust air should be properly filtered to prevent release of contaminants back into the workroom.

   - There should be separate break areas for consuming food and beverages that are kept free of harmful dusts.

   - Clothes contaminated with hazardous dusts should not be blown or shaken to remove dust.

   b.   Document poor housekeeping and hygiene practices.

process information in determining whether additional monitoring for other chemicals should be performed.

b.   Significant concentrations of airborne contaminants may be encountered in many operations in the primary metal industries. Processes that should be evaluated include but are not limited to: handling of scrap, the smelting process, the treatment and inoculation of molten metal before pouring, core- and mold-making processes, pouring molten metal, cooling of casts, casting knockout, casting finishing operations, and the clean-out and re-lining of furnaces.

6.   CSHO Protection.

CSHOs conducting these inspections should have some training or experience in the primary metal industry. CSHOs must don the appropriate PPE before entering any hazardous areas. Hard hat, safety shoes, safety glasses (or goggles), and hearing protection will usually be required when inspecting any of these areas.

CSHOs must remain at least twenty feet from melting and pouring operations.

When inspecting melting and pouring operations, CSHOs should avoid the use of urethane foam earplugs, which may be combustible.

CSHOs shall wear long sleeve cotton shirts and long pants. They should not wear polyester, nylon or other manmade fabrics that can melt or readily ignite. Fire-resistant clothing is encouraged. In most foundry areas, long sleeve cotton coveralls which have no outside pockets or cuffs should be worn. Pant legs must cover the top of the boot edge.

CSHOs are not anticipated to be handling chemicals in foundries; however, the presence of airborne gases, fumes, and caustics, which may cause dermal irritation require the use of gloves. Leather gloves are mildly chemical resistant and heat tolerant. Where chemical exposures are found to be higher than average, treated leather or Kevlar gloves should be worn. Sleeves must cover the cuff of the glove. CSHOs should not tuck sleeves into the cuffs of the gloves. When the arm is fully extended, the cuff of the glove and sleeve must not allow bare skin to be exposed.

Impact and chemical-resistant goggles are appropriate for these industries. Safety glasses with side shields are not recommended in the presence of and potential exposure to caustics, corrosives, dusts and acid. Impact resistance is required since the industry has the potential for flying and falling debris. Where molten ferrous metal operations must be viewed for

10

a significant length of time, #3-#5 green goggles (or #3-#5 safety glasses under goggles) should be worn.

Respiratory protection may also be required in many work areas. A list of potential contaminants is found in Appendix A. When in the vicinity of operations where the presence of silica is known or suspected, CSHOs shall wear a half-mask or full face respirator equipped with N100 cartridge(s). If other respiratory hazards exist, CSHOs shall wear the appropriate combination cartridge.

CSHOs should discuss the need for further PPE with their Team Leader or Area Director.

C.   Citation Guidance.

    1.   OSHA PELs.

Where exposures are in excess of the permissible exposure limits (PELs), ceiling limits (C) or STELs, for substances listed in Tables Z-1, Z-2, or Z-3 of 29 CFR 1910.1000, cite the applicable sections of 29 CFR 1910.1000.

    2.   Engineering and Work Practice Controls.

If an employer has failed to implement administrative, engineering or work practice controls where feasible for reducing exposures to levels below the PEL, the CSHO shall usually cite 1910.1000(e), or the appropriate engineering control section of the substance-specific standard.

    3.   Respirator Standard.

        a.   If there are respiratory hazards present at the work site and employers have failed to conduct the initial respiratory hazard evaluation, cite 29 CFR 1910.134(d)(1)(iii).

        b.   Where workers are required to use respirators, but the employer has failed to comply with a requirement in the respirator standard, cite the applicable sections of 29 CFR 1910.134.
- Inspection and citation guidance are provided in CPL 02-00-158, Inspection Procedures for the Respiratory Protection Standard.

    4.   Personal Protective Equipment (PPE) Standards.

Pursuant to §1910.132(d), the employer must conduct a hazard assessment to determine if hazards are likely to be present that necessitate the use of PPE and have a written certification that the assessment was conducted.

11

Where chemicals having irritant properties are present, PPE is not being used or is inadequate, and workers' eyes and/or skin are potentially exposed to such chemicals, cite the applicable PPE standard (29 CFR §§1910.132, .133, .138).

    a.    Chemical goggles or other appropriate eye protection must be used when there is a potential for splash or vapor exposure to a substance that is likely to cause injury to the eye.

    b.    Chemical-resistant gloves, or sleeves or other appropriate protection for exposed skin must be used when handling liquid, paste, or powdered substances that could cause dermal injury. CSHOs should consult the MSDS/SDS for the appropriate type of gloves and/or the glove chart in OSHA PPE Publication 3151-12R, 2003.

    c.    The employer must also provide training for exposed workers as indicated in 29 CFR 1910.132. This training must include information on when and how to use appropriate PPE.

    d.    In addition, employers must provide information on the value, limitations and maintenance of this equipment in accordance with 29 CFR §§1910.132 and .134.

5.    Occupational Noise Standard.

    a.    At levels at or above an 8-hour time-weighted-average (TWA) of 85 dBA, an effective hearing conservation program must be implemented. The program must be evaluated for completeness and effectiveness of implementation.

    b.    Where noise levels are above the 90 dBA TWA, hearing protection must be worn by all exposed workers until engineering or administrative controls reduce exposures to below the PEL. Workers who have already experienced a standard threshold shift must wear hearing protection at levels at or above 85 dBA TWA. Cite the applicable paragraph under 1910.95(i)(2).

    c.    When hearing protection is required, employers must make a variety of hearing protectors available at no cost to the workers.

6.    Expanded Health Standards.  Compliance with the elements of the expanded health standards shall be evaluated, if exposures are found to chemicals, such as Lead, §1910.1025, or Cadmium, §1910.1027.

D.    Other Applicable Requirements.

12

1.  Hazard Communication.

    a.    Workers who may be exposed to chemicals are required to be trained on the hazards of the chemicals in the workplace pursuant to 29 CFR 1910.1200(h)(3).

    b.    Workers must be informed of the signs and symptoms of any respiratory, skin or eye conditions associated with exposures to hazardous chemicals in the workplace.

    c.    Employers must ensure that all MSDSs/SDSs are readily accessible to workers. CSHOs should ensure that all containers are labeled with the appropriate hazard warnings.

            Citation Guidance: Detailed inspection and citation guidance, including guidance on how to address inadequate MSDSs/SDSs, is contained in OSHA Instruction CPL 02-02-038 (CPL 2-2.38D)-Inspection Procedures for the Hazard Communication Standard.

            Note: CPL 02-02-038 will soon be revised because of the recent Final Rule for Hazard Communication (77 Fed. Reg. 17574-17896, March 26, 2012), i.e., HCS 2012. Until then, CSHOs shall note the employer's compliance with the effective dates of applicable provisions in the HSC 2012, listed in paragraph 1910.1200(j). For specific guidance, contact the Office of Health Enforcement.

2.  Housekeeping and Hygiene Practices.

    a.    Determine whether the employer's housekeeping and hygiene practices may contribute to overexposure. For example:

- Exposed surfaces should be as free as practicable of hazardous dusts, such as lead and chromium (bulk samples of the dust may need to be collected).

- Contaminated surfaces should not be blown clean with compressed air or other forced air (such as leaf blowers).

- If vacuuming is used for cleaning, the exhaust air should be properly filtered to prevent release of contaminants back into the workroom.

- There should be separate break areas for consuming food and beverages that are kept free of harmful dusts.

- Clothes contaminated with hazardous dusts should not be blown or shaken to remove dust.

    b.    Document poor housekeeping and hygiene practices.

13

3.   Access to Employee Exposure and Medical Records.

    a.   Interview workers to determine whether they were informed of their right to review their medical and exposure records annually and understand their rights regarding the confidentiality of such records.

    b.   Review the employer's recordkeeping program to ensure that the required information is being collected and reported.

    c.   Evaluate the employer's method for ensuring the confidentiality of worker medical records.

    d.   When it is necessary to review worker medical records, ensure that they are obtained and remain confidential in accordance with §1913.10 and §1910.1020.

       Citation Guidance: If violations are found, CSHOs should cite the applicable section of §1910.1020. These rules do not require the creation of any records, only preservation and access requirements.

       Recent revisions to recordkeeping policies and procedures are described in CPL 02-00-135, Recordkeeping Policies and Procedures Manual.

4.   Heat Stress.

    Engineering, administrative and work practice controls should be evaluated in areas where there is a potential for heat stress (e.g., furnaces) and/or when cases of heat stress are recorded on the OSHA 300. Investigation guidelines and other information can be found in the OSHA Technical Manual, Section III, Chapter 4, Heat Stress.

E.   Follow-up Inspections.

Where citations are issued for overexposures, or abatement documentation provided by the employer for other serious citations is not adequate, follow-up site visits shall be conducted to determine whether the employer is eliminating exposures or reducing exposures below the PEL. Where exposures could not feasibly be reduced below the PEL, engineering and administrative controls must still have been implemented to reduce exposures to the extent feasible, and workers provided with adequate respiratory protection and other appropriate PPE where necessary.

F.   Program Evaluation.

This NEP will be evaluated using data collected from case files and follow-up site visit reports submitted by each Area Office to the Regional Offices. The data will

be evaluated to determine the impact of OSHA inspections on the reduction of exposures at each work site. Each Region shall designate an individual who will work with the Office of Health Enforcement.

G.    Coordination.

    1.    National Office. This NEP will be coordinated by the Directorate of Enforcement Programs (DEP) - Office of Health Enforcement (OHE). All questions and comments should be directed to the Office of Health Enforcement. OHE will coordinate with the Directorate of Technical Support and Emergency Management (DTSEM), Office of Occupational Medicine (OOM) and other offices for assistance as needed.

    2.    Regional Office. Each Regional Administrator is required to identify a coordinator for this NEP.

H.    Federal Agencies. Executive Order 12196, Section 1-201, and 29 CFR 1960.16 require Federal Agencies to follow the enforcement policy and procedures contained in this Directive.

I.    IMIS/OIS Coding Instructions. The instruction below is for recording inspections under this NEP. The majority of inspections conducted under this NEP will be "Health" inspections and should be coded as such. When this NEP is conducted in conjunction with an SST inspection, the OSHA-1 Forms shall be marked as "programmed planned" in item 24, and in item 21, Inspection Category shall be recorded as "H". In addition, the "NEP" value of "SSTARG__" shall be recorded in Item 25d along with the NEP code "PMETALS".

If during an SST inspection (or other safety-related inspections) it is determined the SIC should be one of the 3300 SICs, the NEP code for "PMETALS" shall be recorded.

This new "PMETALS" code applies to the following enforcement forms: OSHA-1, OSHA-7, OSHA-36, OSHA-90 and OSHA-55 (and the corresponding OIS pages/tabs).

Whenever a consultation visit is made in response to this NEP, Consultation request/visit forms are to be completed with the NEP code "PMETALS" in item 25 on Form-20, and in item 28 on Form-30 (and the corresponding OIS pages/tabs).

XV.    Consultation. Regional and Area Offices are encouraged to work with their State OSHA Consultation Office to communicate the goals of this NEP. When appropriate, 21(d) Consultation Projects are encouraged to develop and conduct their own outreach activities to address exposures to physical and chemical hazards.

## Appendix A
## Chemical Exposure Hazards Found in Primary Metal Industries

acrolein
ammonia
antimony
arsenic
asbestos
benzene
2-butoxyethanol
carbon dioxide
carbon monoxide
chlorine
chromium
coal tar pitch volatiles
copper fume
dimethylamine
dimethyl ethylamine
formaldehyde
furfuryl alcohol
hydrogen chloride
hydrogen sulfide
iron oxide
isocyanates
isopropyl alcohol
lead
methane
methyl alcohol
methyl formate
methylene bisphenyl isocyanate
molybdenum
naphthalene

nitric acid
nitrogen
nuisance dust
ozone
phenol
polycyclic aromatic hydrocarbons
propane
silica
sulfuric acid
sulfur dioxide
tetraethyl lead
toluene
vanadium
wood dust
xylene
zinc oxide

metal dusts including:
  iron
  aluminum
  manganese
  beryllium
  cadmium
  tin
  copper
  silver
  nickel
  lead

Appendix B
Primary Metal Industries - SIC/NAICS Codes

The Primary Metal Industries (PMI) are a group of establishments engaged in the smelting and refining of both ferrous and nonferrous metals. These metals are refined from ore, pig, and scrap, during rolling, drawing, casting, and alloying metal operations. Some of the products they manufacture include nails, spikes, insulated wires and cables, steel piping, sheets and bars, copper and aluminum products, and coke. These SIC/NAICS codes include:

3312 – Steel Works, Blast Furnaces (including Coke Ovens), and Rolling Mills
(NAICS 324199, 331111, 331221)
3313 – Electrometallurgical Products Except Steel
(NAICS 331112)
3316 - Cold-Rolled Steel Sheet, Strip and Bars
(NAICS 331221)
3317 - Steel Pipe and Tubes
(NAICS 331210)
3321 - Gray and Ductile Iron Foundries
(NAICS 331511)
3322 – Malleable Iron Foundries
(NAICS 331511)
3325 – Steel Foundries, Not Elsewhere Classified
(NAICS 331513)
3331 – Primary Smelting and Refining of Copper
(NAICS 331411)
3334 – Primary Production of Aluminum
(NAICS 331312)
3339 – Primary Smelting and Refining of Nonferrous Metals, Except Copper and Aluminum (NAICS 331419)
3341 – Secondary Smelting and Refining of Nonferrous Metals
(NAICS 331314, 331423, 331492)
3351 – Rolling, Drawing and Extruding of Copper
(NAICS 331421)
3354 – Aluminum Extruded Products
(NAICS 331316)
3366 – Copper Foundries
(NAICS 331525)
3365 – Aluminum Foundries
(NAICS 331524)
3369 – Nonferrous Foundries Except Aluminum and Copper
(NAICS 331528)

Chapter 2

# OSHA's Field Operations Manual (FOM)



OSHA  Occupational
Safety and Health
Administration



EXHIBIT B

# OSHA INSTRUCTION

**U.S. DEPARTMENT OF LABOR**          **Occupational Safety and Health Administration**

| DIRECTIVE NUMBER:  CPL 02-00-150 | EFFECTIVE DATE:  April 22, 2011 |
|---|---|
| SUBJECT: Field Operations Manual (FOM) | |

## ABSTRACT

**Purpose:**  This instruction cancels and replaces OSHA Instruction CPL 02-00-148, Field Operations Manual (FOM), issued November 9, 2009, which replaced the September 26, 1994 Instruction that implemented the Field Inspection Reference Manual (FIRM). The FOM is a revision of OSHA's enforcement policies and procedures manual that provides the field offices a reference document for identifying the responsibilities associated with the majority of their inspection duties. This Instruction also cancels OSHA Instruction FAP 01-00-003 Federal Agency Safety and Health Programs, May 17, 1996 and Chapter 13 of OSHA Instruction CPL 02-00-045, Revised Field Operations Manual, June 15, 1989.

**Scope:**  OSHA-wide.

**References:**  Title 29 Code of Federal Regulations §1903.6, Advance Notice of Inspections; 29 Code of Federal Regulations §1903.14, Policy Regarding Employee Rescue Activities; 29 Code of Federal Regulations §1903.19, Abatement Verification; 29 Code of Federal Regulations §1904.39, Reporting Fatalities and Multiple Hospitalizations to OSHA; and Housing for Agricultural Workers: Final Rule, Federal Register, March 4, 1980 (45 FR 14180).

**Cancellations:**  OSHA Instruction CPL 02-00-148, Field Operations Manual, November 9, 2009.
OSHA Instruction FAP 01-00-003, Federal Agency Safety and Health Programs, May 17, 1996.
Chapter 13 of OSHA Instruction CPL 02-00-045, Revised Field Operations Manual, June 15, 1989.

**State Impact:**  Notice of Intent and Adoption required.  See paragraph VI.

**Action Offices:**  National, Regional, and Area Offices

## Executive Summary

This instruction cancels and replaces OSHA Instruction CPL 02-00-148, Field Operations Manual (FOM), issued November 9, 2009. The one remaining part of the prior Field Operations Manual, the chapter on Disclosure, will be added at a later date. This Instruction also cancels OSHA Instruction FAP 01-00-003 Federal Agency Safety and Health Programs, May 17, 1996 and Chapter 13 of OSHA Instruction CPL 02-00-045, Revised Field Operations Manual, June 15, 1989. This Instruction constitutes OSHA's general enforcement policies and procedures manual for use by the field offices in conducting inspections, issuing citations and proposing penalties.

## Significant Changes

- A new Table of Contents for the entire FOM is added.

- A new References section for the entire FOM is added

- A new Cancellations section for the entire FOM is added.

- Adds a Maritime Industry Sector to Section III of Chapter 10, *Industry Sectors*.

- Revises sections referring to the Enhanced Enforcement Program (EEP) replacing the information with the Severe Violator Enforcement Program (SVEP).

- Adds Chapter 13, *Federal Agency Field Activities*.

- Cancels OSHA Instruction FAP 01-00-003, Federal Agency Safety and Health Programs, May 17, 1996.

# Disclaimer

This manual is intended to provide instruction regarding some of the internal operations of the Occupational Safety and Health Administration (OSHA), and is solely for the benefit of the Government. No duties, rights, or benefits, substantive or procedural, are created or implied by this manual. The contents of this manual are not enforceable by any person or entity against the Department of Labor or the United States. Statements which reflect current Occupational Safety and Health Review Commission or court precedents do not necessarily indicate acquiescence with those precedents.

# Table of Contents

## CHAPTER 1
## INTRODUCTION

I.    PURPOSE. ......................................................................................1-1

II.   SCOPE. ..........................................................................................1-1

III.  REFERENCES ................................................................................1-1

IV.  CANCELLATIONS. ......................................................................1-8

V.   ACTION INFORMATION. ..........................................................1-8

     A.  RESPONSIBLE OFFICE. ..................................................................... 1-8
     B.  ACTION OFFICES. ............................................................................. 1-8
     C.  INFORMATION OFFICES. .................................................................... 1-8

VI.  STATE IMPACT. ............................................................................1-8

VII. SIGNIFICANT CHANGES. .........................................................1-9

VIII. BACKGROUND. ...........................................................................1-9

IX.  DEFINITIONS AND TERMINOLOGY. .....................................1-10

     A.  THE ACT. ....................................................................................... 1-10
     B.  COMPLIANCE SAFETY AND HEALTH OFFICER (CSHO). ...................... 1-10
     C.  HE/SHE AND HIS/HERS. ................................................................... 1-10
     D.  PROFESSIONAL JUDGMENT. .............................................................. 1-10
     E.  WORKPLACE AND WORKSITE. ........................................................... 1-10

## CHAPTER 2
## PROGRAM PLANNING

I.    INTRODUCTION. ..........................................................................2-1

II.   AREA OFFICE RESPONSIBILITIES. ........................................2-1

     A.  PROVIDING ASSISTANCE TO SMALL EMPLOYERS. ................................. 2-1
     B.  AREA OFFICE OUTREACH PROGRAM. .................................................. 2-1
     C.  RESPONDING TO REQUESTS FOR ASSISTANCE. ...................................... 2-2

III.  OSHA COOPERATIVE PROGRAMS OVERVIEW. ...................2-2

     A.  VOLUNTARY PROTECTION PROGRAM (VPP). ...................................... 2-2
     B.  ONSITE CONSULTATION PROGRAM. ................................................... 2-2
     C.  STRATEGIC PARTNERSHIPS. ............................................................... 2-3
     D.  ALLIANCE PROGRAM. ...................................................................... 2-3

IV.  ENFORCEMENT PROGRAM SCHEDULING. ...........................2-4

     A.  GENERAL. ....................................................................................... 2-4
     B.  INSPECTION PRIORITY CRITERIA. ....................................................... 2-4
     C.  EFFECT OF CONTEST. ....................................................................... 2-5
     D.  ENFORCEMENT EXEMPTIONS AND LIMITATIONS. ................................. 2-6
     E.  PREEMPTION BY ANOTHER FEDERAL AGENCY. ................................... 2-6
     F.  UNITED STATES POSTAL SERVICE. .................................................... 2-7

    G.  HOME-BASED WORKSITES. ........................................................................2-8
    H.  INSPECTION/INVESTIGATION TYPES. ......................................................2-8

**V.  UNPROGRAMMED ACTIVITY – HAZARD EVALUATION AND INSPECTION SCHEDULING**................................................................**2-9**

**VI.  PROGRAMMED INSPECTIONS.** ...........................................................**2-10**

    A.  SITE-SPECIFIC TARGETING (SST) PROGRAM. ..................................2-10
    B.  SCHEDULING FOR CONSTRUCTION INSPECTIONS. ...........................2-10
    C.  SCHEDULING FOR MARITIME INSPECTIONS. ...................................2-11
    D.  SPECIAL EMPHASIS PROGRAMS (SEPs). .......................................2-12
    E.  NATIONAL EMPHASIS PROGRAMS (NEPs). .....................................2-13
    F.  LOCAL EMPHASIS PROGRAMS (LEPs) AND REGIONAL EMPHASIS PROGRAMS (REPs)............2-13
    G.  OTHER SPECIAL PROGRAMS. ........................................................2-13
    H.  INSPECTION SCHEDULING AND INTERFACE WITH COOPERATIVE PROGRAM PARTICIPANTS. ...2-13

# CHAPTER 3
# INSPECTION PROCEDURES

**I.  INSPECTION PREPARATION.** ...............................................................**3-1**

**II.  INSPECTION PLANNING.** ......................................................................**3-1**

    A.  REVIEW OF INSPECTION HISTORY. .................................................3-1
    B.  REVIEW OF COOPERATIVE PROGRAM PARTICIPATION. .....................3-1
    C.  OSHA DATA INITIATIVE (ODI) DATA REVIEW. ................................3-2
    D.  SAFETY AND HEALTH ISSUES RELATING TO CSHOs. ......................3-2
    E.  ADVANCE NOTICE. .......................................................................3-3
    F.  PRE-INSPECTION COMPULSORY PROCESS. .....................................3-5
    G.  PERSONAL SECURITY CLEARANCE. ................................................3-5
    H.  EXPERT ASSISTANCE. ...................................................................3-5

**III.  INSPECTION SCOPE.** ..........................................................................**3-6**

    A.  COMPREHENSIVE. .........................................................................3-6
    B.  PARTIAL. ......................................................................................3-6

**IV.  CONDUCT OF INSPECTION.** ...............................................................**3-6**

    A.  TIME OF INSPECTION. ...................................................................3-6
    B.  PRESENTING CREDENTIALS. ...........................................................3-6
    C.  REFUSAL TO PERMIT INSPECTION AND INTERFERENCE. ...................3-7
    D.  EMPLOYEE PARTICIPATION. ...........................................................3-9
    E.  RELEASE FOR ENTRY. ...................................................................3-9
    F.  BANKRUPT OR OUT OF BUSINESS. .................................................3-9
    G.  EMPLOYEE RESPONSIBILITIES. ....................................................3-10
    H.  STRIKE OR LABOR DISPUTE. .......................................................3-10
    I.  VARIANCES. ...............................................................................3-11

**V.  OPENING CONFERENCE.** ..................................................................**3-11**

    A.  GENERAL. ..................................................................................3-11
    B.  REVIEW OF APPROPRIATION ACT EXEMPTIONS AND LIMITATION. ....3-13
    C.  REVIEW SCREENING FOR PROCESS SAFETY MANAGEMENT (PSM) COVERAGE. .............3-13
    D.  REVIEW OF VOLUNTARY COMPLIANCE PROGRAMS. ........................3-14
    E.  DISRUPTIVE CONDUCT. ...............................................................3-15
    F.  CLASSIFIED AREAS. ....................................................................3-16

# Chapter 2

# PROGRAM PLANNING

I. **Introduction.**

OSHA's mission is to assure the safety and health of America's working men and women by promulgating and enforcing standards and regulations; providing training, outreach, and education; establishing partnerships; and encouraging continual improvement in workplace safety and health as well as the development of comprehensive safety and health management systems. Effective and efficient use of resources requires careful, flexible planning. In this way, the overall goal of hazard abatement and employee protection is best served.

II. **Area Office Responsibilities.**

A. **Providing Assistance to Small Employers.**

1. In 1996, the Congress passed the Small Business Regulatory Enforcement Fairness Act (SBREFA) to respond to the concern expressed by the small business community that Federal regulations were too numerous and complex, and that small business needed special assistance in understanding and complying with those regulations.

2. SBREFA requires all Federal agencies regulating small businesses to have in place programs to provide guidance and compliance assistance. These programs must contain procedures to answer inquiries by small entities (small businesses). These programs also provide information on and advice about compliance with the statutes and regulations; interpretations; and applications of the law to specific sets of facts supplied by the small entity.

   *NOTE: See CPL 02-00-121*, Providing Assistance to Smaller Employers, *dated March 12, 1998.*

B. **Area Office Outreach Program.**

The Area Director or designee will ensure that the Area Office maintains an outreach program appropriate to local conditions and the needs of the service area. The plan may include Regional and National Office support services, compliance assistance services including assistance in developing compliance safety and health management systems, training and education services, referral services, cooperative programs, abatement assistance, and technical services.

C.    **Responding to Requests for Assistance.**

All requests from employers or employees for compliance information or assistance shall receive timely, accurate, and helpful responses from OSHA. See the section on Information Requests in this chapter for additional information.

III.   **OSHA Cooperative Programs Overview.**

OSHA offers a number of avenues for businesses and organizations to work cooperatively with the Agency. Compliance Officers should discuss the various cooperative programs with employers.

A.    **Voluntary Protection Program (VPP).**

The Voluntary Protection Program (VPP) is designed to recognize and promote effective safety and health management. A hallmark of VPP is the principle that management, labor, and OSHA can work together in pursuit of a safe and healthy workplace. A VPP participant is an employer that has successfully designed and implemented a health and safety management system at its worksite, and it is exempt from programmed inspections.

*NOTE: See CSP 03-01-003, Voluntary Protection Programs (VPP): Policies and Procedures Manual, dated April 18, 2008, for additional information.*

B.    **Onsite Consultation Program.**

1.    OSHA onsite consultation programs are available in all 50 states as well as the District of Columbia, Guam, Northern Marianas Islands, Puerto Rico and the Virgin Islands under Section 21(d) and 23(g) agreements with Federal OSHA or under State plans approved by OSHA.

a.    The State Onsite Consultation Program offers a variety of services at no cost to employers. These services include assisting in the development and implementation of an effective safety and health management system, and offering training and education to the employer and employees at the worksite. Smaller businesses in high hazard industries or those involved in hazardous operations receive priority.

b.    The State Onsite Consultation Program is separate from OSHA's enforcement efforts. Under onsite consultation programs, no citations are issued, nor are penalties proposed.

2. **Safety and Health Achievement Recognition Program (SHARP).**

   a. Another program that recognizes employers' efforts to create a safe workplace and exempts them from programmed inspections is the Safety and Health Achievement Recognition Program (SHARP). This program is administered by the State Onsite Consultation Program but is funded under Section 21(d) of the Act.

   b. SHARP is designed to provide incentives and support those employers that implement and continuously improve effective safety and health management system(s) at their worksite. SHARP participants are exempted from OSHA programmed inspections.

   *NOTE: See CSP 02-00-001,* Consultation Policies and Procedures Manual, *dated August 6, 2001, for additional information.*

**C.    Strategic Partnerships.**

Organizations can enter into Strategic Partnerships with OSHA to address specific safety and health issues. In these partnerships, OSHA enters into extended, voluntary, cooperative relationships with groups of employers, employees, and employee representatives (sometimes including other stakeholders, and sometimes involving only one employer) in order to encourage, assist, and recognize efforts to eliminate serious hazards and to achieve a high level of employee safety and health.

*NOTE: See CSP 03-02-002,* OSHA Strategic Partnership Program for Worker Safety and Health, *dated February 10, 2005, for additional information.*

**D.    Alliance Program.**

Through the Alliance Program, OSHA works with groups committed to safety and health, including businesses, trade or professional organizations, unions and educational institutions, to leverage resources and expertise to develop compliance assistance tools and resources and share information with employers and employees to help prevent injuries, illnesses and fatalities in the workplace. OSHA and the organization sign a formal agreement with goals that address training and education, outreach and communication, and promote the national dialogue on workplace safety and health.

*NOTE: See CSP 04-01-001,* OSHA Alliance Program, *dated June 10, 2004, for additional information.*

*NOTE: See Section VI.H. of this chapter,* Enforcement Scheduling and Interface with Cooperative Program Participants, *for additional information.*

## IV.   Enforcement Program Scheduling.

### A.   General.

1.   OSHA's priority system for conducting inspections is designed to allocate available OSHA resources as effectively as possible to ensure that maximum feasible protection is provided to working men and women. The Area Director or designee will ensure that inspections are scheduled within the framework of this chapter, that they are consistent with the objectives of the Agency, and that appropriate documentation of scheduling practices is maintained.

2.   The Area Director or designee will also ensure that OSHA resources are effectively distributed during inspection activities. If an inspection is of a complex nature, the Area Director or designee may consider utilizing additional OSHA resources (e.g., the Health Response Team). In other circumstances, the use of outside resources may aid the Area or District Office to deploy available resources more effectively. The Area Office will retain control of the inspection.

### B.   Inspection Priority Criteria.

Generally, priority of accomplishment and of assigning staff resources for inspection categories is as shown in Table 2-1 below:

#### Table 2-1: Inspection Priorities

| Priority | Category |
|----------|----------|
| First | Imminent Danger |
| Second | Fatality/Catastrophe |
| Third | Complaints/Referrals |
| Fourth | Programmed Inspections |

1.   **Efficient Use of Resources.**

Deviations from this priority list are allowed so long as they are justifiable, lead to the efficient use of resources, and promote effective employee protection. An example of such a deviation would be when the Agency, Regional Administrator or an Area

Director commits a certain percentage of resources to programmed Special Emphasis Program (SEP) inspections such as a National Emphasis Program (NEP), a Local Emphasis Program (LEP), or Regional Emphasis Program (REP). Inspection scheduling deviations must be documented in the case file.

2. **Follow-up Inspections**.

In cases where follow-up inspections are necessary, they shall be conducted as promptly as resources permit. In general, follow-up inspections shall take priority over all programmed inspections and any unprogrammed inspection in which the hazards are anticipated to be other-than-serious.

*NOTE: See Chapter 7, Post-Citation Procedures and Abatement Verification. for additional information.*

3. **Monitoring Inspections**.

When a monitoring inspection is necessary, the priority is the same as for a follow-up inspection.

*NOTE: See Chapter 7, Post-Citation Procedures and Abatement Verification. for additional information.*

4. **Employer Information Requests**.

Contacts for technical information initiated by employers or their representatives will not trigger an inspection, nor will such employer inquiries protect the requesting employer against inspections conducted pursuant to existing policy, scheduling guidelines and inspection programs established by the Agency.

5. **Reporting of Imminent Danger, Catastrophe, Fatality, Amputations, Accidents, Referrals or Complaints**.

The Area Director or designee will act in accordance with established inspection priority procedures.

*NOTE: See Section V. of this chapter. Unprogrammed Activity – Hazard Evaluation and Inspection Scheduling, for additional information.*

**C.   Effect of Contest.**

If an employer has contested a citation and/or a penalty from a previous inspection at a specific worksite, and the case is still pending before the

2-5

Review Commission, the following guidelines apply to additional inspections of the employer at that worksite:

1.     If the employer has contested the penalty only, the inspection will be scheduled as if there were no contest;

2.     If the employer has contested the citation itself or any items therein, then programmed and unprogrammed inspections will be scheduled, but all under contest will be excluded from the inspection unless a potential imminent danger is involved.

       *NOTE: See Paragraph IV.B., Inspection Priority Criteria, of this chapter for additional information.*

**D.     Enforcement Exemptions and Limitations.**

1.     In providing funding for OSHA, Congress has consistently placed restrictions on enforcement activities for two categories of employers: small farming operations and small employers in low-hazard industries. Congress may place exemptions and limitations on OSHA activities through the annual Appropriations Act.

2.     Before initiating an inspection of an employer in these categories the Area Office will evaluate whether the Appropriations Act for the fiscal year would prohibit the inspection. Where this determination cannot be made beforehand, the CSHO will determine the status of the small farming operation or a small employer in a low-hazard industry upon arrival at the workplace. If the prohibition applies, the inspection shall immediately be discontinued.

       *NOTE: See CPL 02-00-051, Enforcement Exemptions and Limitations under the Appropriation Act, dated May 28, 1998, for additional information.*

**E.     Preemption by Another Federal Agency.**

1.     Section 4(b)(1) of the Act states that the Act does not apply to working conditions over which other federal agencies exercise statutory responsibility to prescribe standards for safety and health. The determination of preemption by another Federal agency is, in many cases, a highly complex matter.

2.     If a question arises, usually upon receipt of a complaint, referral, or other inquiry, consult the list of Memorandums of Understanding (MOU) on the OSHA website to determine if the issue has been

previously addressed. A MOU is an agreement created to address/resolve coverage issues and to improve the working relationships between other Federal agencies and organizations regarding employee safety and health.

3. At times, an inspection may have already begun when the coverage jurisdiction question arises. Any such situation will be brought to the attention of the Area Director or designee as soon as they arise, and dealt with on a case-by-case basis.

4. Two examples of MOUs include the following:

   a. <u>Mine Safety and Health Administration</u> - Interagency Agreement between the Mine Safety and Health Administration and OSHA, dated March 29, 1979.

   b. <u>United States Coast Guard/U.S. Department of Transportation</u> - Authority of Coast Guard and OSHA regarding enforcement of safety and health standards aboard vessels inspected and certified by the Coast Guard, dated March 4, 1983.

**F.   United States Postal Service.**

1. <u>The Postal Employee Safety Enhancement Act of 1998</u> applies the Act to the U.S. Postal Service in the same manner as the Act applies to a private sector employer.

2. All State Plan States elected not to cover the U.S. Postal Service. Thus, Federal OSHA retains authority to cover the U.S. Postal Service nationwide. Federal coverage in State Plan States encompasses U.S. Postal Service employees and contract employees engaged in U.S. Postal Service mail operations. Coverage includes contractor-operated facilities engaged in mail operations and postal stations in public or commercial facilities. State Plan States continue to exercise jurisdiction over all other private sector contractors working on U.S. Postal Service sites who are not engaged in U.S. Postal Service mail operations, such as building maintenance and construction employees. See the Final Rule on State Plans Coverage of the U.S. Postal Service (*Federal Register*, June 9, 2000 (<u>65 FR 36618</u>))

3. Violations documented during inspections initiated at a U.S. Postal Service site will be cited with penalties in accordance with the FOM and other applicable OSHA policies for the private sector.

*NOTE: See CPL 02-00-122, Enforcement Guidance for the U.S. Postal Service, dated April 16, 1999, for additional information.*

**G.    Home-Based Worksites.**

1.    The agency will not perform any inspections of employees' home offices. A home office is defined as office work activities in a home-based setting/worksite (e.g., filing, keyboarding, computer research, reading, writing) and may include the use of office equipment (e.g., telephone, facsimile machine, computer, scanner, copy machine, desk, file cabinet).

2.    OSHA will only conduct inspections of other home-based worksites, such as home manufacturing operations, when it receives a complaint or referral alleging that a violation of a safety or health standard exists that threatens physical harm, that an imminent danger is present, or that there was a work-related fatality.

*NOTE: See CPL 02-00-125, Home-Based Worksites, dated February 25, 2000, for additional information.*

**H.    Inspection/Investigation Types.**

1.    **Unprogrammed.**

a.    Inspections scheduled in response to alleged hazardous working conditions identified at a specific worksite are classified as unprogrammed. This type of inspection responds to:

b.    Imminent Dangers;

c.    Fatalities/catastrophes;

d.    Complaints; and

e.    Referrals.

f.    It also includes follow-up and monitoring inspections scheduled by the Area Office.

*NOTE: This category includes all employers/employees directly affected by the subject of the unprogrammed inspection activity, and is especially applicable on multi-employer worksites.*

2-8

*NOTE: Not all complaints and referrals qualify for an inspection. See Chapter 9, Complaint and Referral Processing, for additional information.*

*NOTE: See CPL 02-00-124, Multi-Employer Worksite Citation Policy, dated December 10, 1999, for additional information.*

2.   **Unprogrammed Related.**

    a.   Inspections of employers at multi-employer worksites whose operations are not directly addressed by the subject of the conditions identified in a complaint, accident, or referral are designated as unprogrammed related.

    b.   An example would be: A trenching inspection conducted at the unprogrammed worksite where the trenching hazard was not identified in the complaint, accident report, or referral.

3.   **Programmed.**

Inspections of worksites which have been scheduled based upon objective or neutral selection criteria are programmed inspections, such as the Site Specific Targeting (SST) Program. The worksites are selected according to national scheduling plans for safety and for health or under local, regional, and national special emphasis programs.

4.   **Program Related.**

Inspections of employers at multi-employer worksites whose activities were not included in the programmed assignment, such as a low injury rate employer at a worksite where programmed inspections are being conducted for all high rate employers.

V.   **Unprogrammed Activity – Hazard Evaluation and Inspection Scheduling.**

Enforcement procedures relating to unprogrammed activity are located in subject specific chapters of this manual:

▶   Imminent Danger, see Chapter 11, *Imminent Danger, Fatality, Catastrophe, and Emergency Response.*

▶   Fatality/Catastrophe, see Chapter 11, *Imminent Danger, Fatality, Catastrophe, and Emergency Response.*

    ▶ Emergency Response, see <u>Chapter 11</u>, *Imminent Danger, Fatality, Catastrophe, and Emergency Response.*

    ▶ Complaint/Referral Processing, see <u>Chapter 9</u>, *Complaint and Referral Processing.*

    ▶ Whistleblower Complaints, see <u>Chapter 9</u>, *Complaint and Referral Processing..*

    ▶ Follow-ups and Monitoring, see <u>Chapter 7</u>, *Post-Citation Procedures and Abatement Verification.*

## VI.  Programmed Inspections.

### A.  Site-Specific Targeting (SST) Program.

In order to achieve OSHA's goal of reducing the number of injuries and illnesses that occur at individual worksites, the Site-Specific Targeting (SST) program directs enforcement resources to those worksites where the highest rate of injuries and illness have occurred. The SST is OSHA's primary programmed inspection plan for non-construction worksites that have 40 or more employees. The SST Program is based on the data collected by the OSHA Data Initiative (ODI). The ODI collects injury and illness data from approximately 80,000 employers.

*NOTE: For in-depth information on how the SST program works see OSHA's most recent Site Specific Targeting Program.*

### B.  Scheduling for Construction Inspections.

Due to the mobility of the construction industry, the transitory nature of construction worksites, and the fact that construction worksites frequently involve more than one employer, inspections are scheduled from a list of construction worksites rather than construction employers. The University of Tennessee will provide to each Area/District Office a randomly selected list of construction projects from identified or known covered active projects. This list will contain the projected number of sites which the field office has reported it plans on inspecting during the next month. Projects are selected in accordance with the inspection schedule for construction.

*NOTE: See <u>CPL 02-00-141</u>, Inspection Scheduling for Construction, dated July 14, 2006.*

**C.    Scheduling for Maritime Inspections.**

Marine inspection activities will be covered in greater detail in Chapter 10, Section III, *Maritime* [Reserved].

1.    **Marine Cargo Handling Industry.**

The marine cargo handling industry is made up of longshoring activities (i.e., cargo handing aboard vessels) and activities within marine terminals (i.e., cargo handling ashore). Due to the unique differences among these activities, several scheduling methods are necessary. Consequently, marine cargo handling industry inspections can be scheduled as National Emphasis Programs (NEPs), Site-Specific Targeting (SST), Local Emphasis Programs (LEPs), or from lists developed in accordance with CPL 02-00-025, *Scheduling System for Programmed Inspections*, dated January 4, 1995.

*NOTE: See CPL 02-00-139, Longshoring and Marine Terminals "Tool Shed" Directive, dated May 23, 2006, for more information.*

2.    **Shipbreaking.**

CPL 02-00-136, *OSHA's National Emphasis Program (NEP) on Shipbreaking,* dated March 16, 2005, describes policies and procedures to reduce or eliminate workplace hazards associated with shipbreaking operations.

Also, OSHA has entered into a Memorandum of Agreement (MOA) on Interagency Coordination and Cooperation for Ship Scrapping (i.e., shipbreaking) between DOD, DOT, EPA, and DOL-OSHA, dated November 16, 1999.

3.    **Shipyard Employment.**

The shipyard employment industry is made up of several industrial activities and due to the unique differences among these activities, several scheduling methods are necessary. Consequently, shipyard employment inspections can be scheduled under NEPs, SST, LEPs, or from lists developed in accordance with CPL 02-00-025, *Scheduling System for Programmed Inspections*, dated January 4, 1995.

*NOTE: See CPL 02-00-142, Shipyard Employment "Tool Bag" Directive, dated August 3, 2006, for more information.*

2-11

**D.    Special Emphasis Programs (SEPs).**

Special Emphasis Programs provide for programmed inspections of establishments in industries with potentially high injury or illness rates that are not covered by other programmed inspection scheduling systems or, if covered, where the potentially high injury or illness rates are not addressed to the extent considered adequate under the specific circumstances. SEPs are also based on potential exposure to health hazards. Special emphasis programs may also be used to develop and implement alternative scheduling procedures or other departures from national procedures. Special emphasis programs can include National Emphasis Programs, Regional Emphasis Programs and Local Emphasis Programs.

1.    **Identification of Special Emphasis Programs.**

The description of the particular Special Emphasis Program shall be identified by one or more of the following:

a.   Specific industry;

b.   Trade/craft;

c.   Substance or other hazard;

d.   Type of workplace operation;

e.   Type/kind of equipment; and

f.   Other identifying characteristic.

2.    **Special Emphasis Program Scope.**

The reasons for and the scope of a Special Emphasis Program shall be described; and may be limited by geographic boundaries, size of worksite, or similar considerations.

3.    **Pilot Programs.**

National or local pilot programs may also be established under Special Emphasis Programs. Such programs may be conducted for the purpose of assessing the actual extent of suspected or potential hazards, determining the feasibility of new or experimental compliance procedures, or for any other legitimate reason.

E.    **National Emphasis Programs (NEPs).**

OSHA develops National Emphasis Programs to focus outreach efforts and inspections on specific hazards in a workplace.

F.    **Local Emphasis Programs (LEPs) and Regional Emphasis Programs (REPs).**

1.    LEPs and REPs are types of special emphasis program in which one or more Area Offices of a Region participate. LEPs and REPs are generally based on knowledge of local industry hazards or local industry injury/illness experience. LEPs and REPs must be developed and approved when one or more Area Offices within a Region target inspections to a specific industry(ies), hazard(s), or other workplace characteristic(s), e.g., as part of, or in conjunction with, a local initiative or problem-solving project. A list of LEPs may be found on the OSHA website under the Directorate of Enforcement Programs.

*NOTE: See CPL 04-00-001, Procedures for Approval of Local Emphasis Programs (LEPs), dated November 10, 1999, for additional information.*

2.    OSHA directives include topic specific scheduling procedures in addition to the general information provided in this section.

G.    **Other Special Programs.**

The Agency may develop programs to cover special categories of inspections which are not covered under the SST Program or under a Special Emphasis Program.

H.    **Inspection Scheduling and Interface with Cooperative Program Participants.**

1.    Employers who participate in voluntary compliance programs may be exempt from programmed inspections and eligible for inspection deferrals or other enforcement incentives. The Area Director or designee will determine whether the employer is actively participating in a Cooperative Program that would impact inspection and enforcement activity at the worksite being considered for inspection. Where possible, this determination should be made prior to scheduling the inspection.

2.    Information regarding a facility's participation in the following programs should be available prior to scheduling inspection activity:

a.  VPP Program;

b.  Pre-SHARP and SHARP Participants;

c.  OSHA Strategic Partnerships; and

d.  Consultation 90-Day Deferrals.

3.  **Voluntary Protection Program.**

a.  **Regional VPP Manager Responsibilities.**

The Regional VPP managers must keep the Area Director or his/her designee informed regarding VPP applicants and the status of participants in the VPP. This will prevent unnecessary scheduling of programmed inspections at VPP sites and ensure efficient use of resources. Area Directors or his/her designee should be informed:

- That the site can be removed from the programmed inspection list. Such removal may occur no more than 75 days prior to the onsite evaluation;

- Of the site's approval for the VPP program;

- Of the site's withdrawal or termination from the VPP program; and

- If the Regional VPP Manager is the first person notified by the site of an event requiring enforcement, the VPP Manager must instruct the site to contact the appropriate Area Office.

b.  **Programmed Inspections and VPP Participation.**

- **Inspection Deferral.**

Approved sites must be removed from any programmed inspection lists for the duration of participation, unless a site chooses otherwise. The applicant worksite will be deferred starting no more than 75 calendar days prior to the commencement of its scheduled pre-approval onsite review.

- **Inspection Exemption.**

2-14

The exemption from programmed inspections for approved VPP sites will continue for as long as they continue to meet VPP requirements. Sites that have withdrawn or have been terminated from VPP will be returned to the programmed inspection list, if applicable, at the time of the next inspection cycle.

c. **Unprogrammed Enforcement Activities at VPP Sites**.

When an Area Office receives a complaint, or a referral other than from the OSHA VPP onsite team, or is notified of a fatality, catastrophe, or other event requiring an enforcement inspection at a VPP site, the Area Director or designee must initiate the inspection following normal OSHA enforcement procedures.

- The Area Office must immediately notify the Regional VPP Manager of any fatalities, catastrophes or other accidents or incidents occurring at a VPP worksite that require an enforcement inspection; as well as of a referral or complaint that concerns a VPP worksite, including complaint inquiries that would receive a letter response. If the VPP is a national VPP, the National Office should be notified.

- If the Regional VPP Manager is the first person notified by the site of an event requiring an enforcement inspection, the VPP Manager must instruct the site to contact the appropriate Area Office and the National Office if the fatality is on a National VPP site.

- The inspection will be limited to the specific issue of the unprogrammed activity. If citations are issued as a result of the inspection, a copy of the citation will be sent to the Regional VPP Manager. See CSP 03-01-003, *Voluntary Protection Programs (VPP): Policies and Procedures Manual*, dated April 18, 2008.

- The Area Director will send the VPP Manager a copy of any report resulting from an enforcement case.

4. **Consultation**.

a. **Consultation Visit in Progress**.

- If an onsite consultation visit is in progress, it will take priority over OSHA programmed inspections as

2-15

outlined below. An onsite consultation visit will be
considered "in progress" in relation to the working
conditions, hazards, or situations covered by the visit
from the beginning of the opening conference through
the end of the correction due dates and any extensions
thereof. If an onsite consultation visit is already in
progress it will terminate when the following kind of
OSHA compliance inspection is about to take place:

- o Imminent danger inspection;

- o Fatality/catastrophe inspection;

- o Complaint inspections; and/or

- o Other critical inspections, as determined by the
  Assistant Secretary.

- Other "such critical inspections" may include, but are
  not limited to, referrals as defined in *Chapter 9,
  Complaint and Referral Processing.* Following an
  evaluation of the hazards alleged in a referral, if the
  **Assistant Secretary** determines that enforcement
  action is required prior to the end of an abatement
  period established by the state consultation project, the
  consultation visit in progress shall be immediately
  terminated to allow for an enforcement inspection.

- For purposes of efficiency and expediency, an
  employer's worksite shall not be subject to concurrent
  consultation and enforcement-related visits. The
  following excerpts from CSP 02-00-002, *Consultation
  Policies and Procedures Manual, Chapter 7:
  Relationship to Enforcement*, dated January 18, 2008, to
  clarify the interface between enforcement and
  consultation activity at the worksite:

  - o **Full Service OnSite Consultation Visits.**

    While a worksite is undergoing a full service
    onsite consultation visit for safety **and** health,
    programmed enforcement activity may not
    occur until after the end of the worksite's visit
    "In Progress" status.

  - o **Full Service Safety or Health OnSite
    Consultation Visits.**

2-16

When an onsite consultation visit "in Progress" is discipline-related, whether for safety **or** health; programmed enforcement activity may not proceed until after the end of the worksite's visit "in Progress" status and is limited to the discipline examined, safety or health.

o **Limited Service OnSite Consultation Visits.**

If a worksite is undergoing a limited service onsite consultation visit, whether focused on a particular type of work process or a hazard, programmed enforcement activity may not proceed while the consultant is at the worksite. The re-scheduled enforcement activity must be limited only to those areas that were not addressed by the scope of the consultative visit (posted List of Hazards).

o **Enforcement Follow-Up and Monitoring Inspections.**

If an enforcement follow-up or monitoring inspection is scheduled while a worksite is undergoing an onsite consultation visit, the inspection shall not be deferred; however, its scope shall be limited only to those areas required to be covered by the follow-up or monitoring inspection. In such instances, the consultant must halt the onsite visit until the enforcement inspection is completed. In the event OSHA issues a citation(s) as a result of the follow-up or monitoring inspection, an onsite consultation visit may not proceed until the citation(s) becomes a final order(s).

b. **OnSite Consultation and 90-Day Deferral.**

- If an establishment has requested an initial full-service comprehensive consultation visit for safety **and** health from the State OSHA Consultation Program, and that visit has been scheduled by the State Program, a SST inspection may be deferred for 90 calendar days from the date of the notification by the State Program to the Regional Office. No extension of the deferral beyond the 90 calendar days is possible, unless the consultation visit is "in progress."

2-17

- OSHA may, however, in exercising its authority to schedule inspections, assign a lower priority to worksites where consultation visits are scheduled.

  *NOTE: See CSP 02-00-002, Consultation Policies and Procedures Manual, Chapter 7: Relationship to Enforcement, dated January 18, 2008, for additional information.*

5. **Pre-Safety and Health Achievement Recognition Program (Pre-SHARP) Status.**

   a. Those employers who do not meet the SHARP requirements, but who exhibit a reasonable promise of achieving agreed-upon milestones and time frames for SHARP participation, may be granted Pre-SHARP status. Pre-SHARP participants receive a full service, comprehensive consultation visit that involves a complete safety and health hazard identification survey, including a comprehensive assessment of the worksite's safety and health management system.

   b. The deferral time frame recommended by the State Consultation Project Manager must not exceed a total of 18 months from the expiration of the latest hazard correction due date(s), including extensions. Upon achieving Pre-SHARP status, employers may be granted a deferral from OSHA programmed inspections. The following types of incidents can trigger an OSHA enforcement inspection at Pre-SHARP sites:

      - Imminent danger;

      - Fatality/catastrophe; and

      - Formal complaints.

6. **Safety and Health Achievement Recognition Program (SHARP).**

   SHARP is designed to provide support and incentives to those employers that implement and continuously improve effective safety and health management system(s) at their worksite. SHARP participants are exempted from OSHA programmed inspections, see §1908.7(b)(4).

2-18

a. **Duration of SHARP Status**.

All initial approvals of SHARP status will be for a period of up to two years, commencing with the date the Regional Office approves an employer's SHARP application. After the initial approval, all SHARP renewals will be for a period of up to three years.

b. **OSHA Inspection(s) at SHARP Worksites**.

As noted above, employers that meet all the requirements for SHARP status will have the names of their establishments deleted from OSHA's Programmed Inspection Schedule. However, pursuant to §1908.7(b)(4)(ii), the following types of incidents can trigger an OSHA enforcement inspection at SHARP sites: imminent danger; fatality/catastrophe; or formal complaints.

*NOTE: See CSP 02-00-002, Consultation Policies and Procedures Manual, Chapter 8: OSHA's Safety and Health Achievement Recognition Program (SHARP) and Pre-SHARP, dated January 18, 2008, for additional information.*

7. **OSHA Strategic Partnership Program (OSP)**.

a. **Deferral from Programmed Inspection List for Non-Construction OSPs**.

- OSHA may offer up to a six-month deferral from programmed inspections to OSHA Strategic Partnership (OSP) participants upon their entry into a partnership. During the deferral period, the partner must commit to make workplace safety and health improvements or seek compliance assistance to improve workplace safety and health in accordance with its responsibilities under the Act.

- For a majority of OSP agreements, the beginning of the deferral period will be the effective date of the partnership agreement. However, in situations where sites join the partnership on a staggered basis, the deferral period begins at the site's actual entry into the partnership. The partnership agreement should clearly address the issue of OSP participant effective/entry dates.

2-19

b. **Programmed Inspection with a Limited Scope.**

- At OSHA's discretion, an establishment operated by a partner may receive an inspection in which the focus is limited to hazardous areas, operations, conditions or practices at the establishment. The limited scope inspection must focus on the significant worksite and industry-specific hazards based on an analysis of information available, such as:

  o BLS injury and illness data;

  o Site and corporate injury and illness data;

  o Site accident audit and inspection data; and

  o OSHA Target Industry Profiles.

- For inspections with limited scope, the workplace hazards to be addressed will be determined by OSHA with input from the partner(s). OSHA may expand the scope of the inspection based on information gathered during the inspection process.

- To gain a limited scope inspection as a benefit, the establishment must have undergone an onsite non-enforcement verification inspection within one year of the date of the programmed inspection.

c. **Deletion from Programmed Inspection List.**

- **Non-Construction.**

  o Following a comprehensive onsite enforcement inspection conducted to meet OSP verification requirements, an establishment operated by an OSP partner will be deleted from programmed inspection lists for the period of time established for deletions in the then-current OSHA Site-Specific Targeting directive.

  o If the OSP is designed to comprehensively address a hazard covered by the Act, the Area Director or designee, with the approval of the Regional Administrator, may extend the deletion for one year if the partner continues to meet the conditions of the OSP agreement and

2-20

demonstrates improved performance in areas measured by the OSP.

- **Construction.**

  o An OSP agreement may provide that following an appropriate number of comprehensive onsite enforcement inspections conducted to verify satisfaction of OSP requirements, the sites, or portions of sites, over which the employer/partner exercises control is exempt from programmed inspection for a period of up to one year. This exemption is limited to the terms of the specific OSP agreement between the employer and OSHA, which are limited to the geographical boundaries of the OSHA office with whom the partnership was formed (Area, Regional, or National), if not otherwise specified in the agreement. However, it should be noted that if a serious or imminent danger condition is observed by enforcement personnel or reported to OSHA, the partner should be inspected and cited (per Agency policy).

  o This program is available only where the partner has an effective safety and health management system fully compliant with §1926.20 and §1926.21, and the effectiveness of the system has been confirmed during the verification inspections described above. For recordkeeping purposes, the official date of the comprehensive onsite enforcement (verification) inspection is the opening conference. Therefore, the beginning of the deletion period is the date of the opening conference of the verification inspection(s).

  See CSP 03-02-002, *OSHA Strategic Partnership Program for Worker Safety and Health*, dated February 10, 2005, for additional information. This verification process is sometimes referred to as the "tiered approach."

  o One such alternative to the "tiered approach" is described in the June 1, 2006 memorandum, *Clarification of Verification and Exemption Policies for OSHA Strategic Partnership*

2-21

*Program Construction Participants.* Where the partner has advised the appropriate Area/Regional office of the number and location of all worksites covered by the partnership, the RA or AD has discretion to select an appropriate number of verification visits per year. The number should not be more than the number of programmed inspections the RA/AD determines would be conducted during the same time frame. Other criteria include the number of inspections needed to cover all types of work performed by the contractor; the quality of the contractor's safety and health management system; the phases of construction and the nature of associated hazards; and other factors which may affect OSHA's ability to fully and accurately assess the effectiveness of the participant's safety and health management system.

8.   **Alliances.**

Unlike OSHA's OSP, VPP, and SHARP programs, Alliances do not require applications, data collection, verification, or evaluation. Alliances also do not offer incentives, such as focused inspections or inspection deferral, to their signatories.

UNITED STATES
DEPARTMENT OF LABOR

[SEARCH]

A to Z Index | En español | Contact Us | FAQs | About OSHA

**OSHA**     OSHA QuickTakes Newsletter   RSS Feeds   Print This Page   Text Size

Occupational Safety & Health Administration     We Can Help     What's New | Offices

| Home | Workers | Regulations | Enforcement | Data & Statistics | Training | Publications | Newsroom | Small Business | OSHA |

Directives - Table of Contents

| | |
|---|---|
| • **Record Type:** | Instruction |
| • **Directive Number:** | CPL 02-00-025 |
| • **Old Directive Number:** | CPL 2.25I |
| • **Title:** | Scheduling System for Programmed Inspections |
| • **Information Date:** | 01/04/1995 |

OSHA Instruction CPL 2.25I January 4, 1995 Office of Statistics

Subject: Scheduling System for Programmed Inspections

**A. Purpose.** The purpose of this instruction is to transmit a revised CPL 2.25I. This Instruction contains revisions for FY 1995 to the scheduling system for programmed inspections.

**B. Scope.** This instruction applies OSHA-wide.

**C. Cancellation.**

1. OSHA Instruction CPL 2.25H, December 31, 1990, Scheduling System for Programmed Inspections.

2. OSHA Instruction CPL 2.45B, June 15, 1989, Field Operations Manual (FOM), Chapter II, Section F.2.

**D. References.**

1. OSHA Instruction CPL 2.45B, June 15, 1989, Field Operations Manual(FOM), Chapter XI and Chapter XIII.

2. OSHA Instruction CPL 2.51H, March 22, 1993, Exemptions and Limitations under Current Appropriations Act and memorandum dated June 1994 with new appendixes.

3. OSHA Instruction CPL 2.90, June 3, 1991, Guidelines for Administration of Corporate-wide Settlement Agreements.

4. OSHA Instruction CPL 2.95, February 10, 1992, Enforcement Authority at the Department of Energy's Government-Owned, Contractor-Operated Sites.

5. OSHA Instruction CPL 2.102, March 23, 1994, Procedures for Approval of Local Emphasis Programs (LEPs) and Experimental Programs.

6. OSHA Instruction CPL 2.103, September 26, 1994, Field Inspection Reference Manual (FIRM).

7. OSHA Instruction ADM 1-1.30, July 26, 1993, The System Administration Manual.

8. OSHA Instruction ADM 12.5, November 15, 1989, OSHA Compliance Records, Records Disposition Schedule.

9. OSHA Instruction PAE 1.1C May 10, 1993, Field Operation Program Plans.

**E. Action.** Regional Administrators and Area Directors shall ensure that the policies and procedures established in this Instruction are transmitted to all Area and District Offices, and to appropriate staff members.

**F. Federal Agencies.** This instruction describes a change that affects Federal Agencies. Executive Order 12196, Section 1-201, and 29 CFR 1960.16, maintains that Federal agencies must also follow the enforcement policy and procedures contained in this instruction.

**G. Federal Program Change.** This instruction describes a Federal program change which affects State programs. Each Regional Administrator shall:

1. Ensure that this change is promptly forwarded to each State designee using a format consistent with the Change Two-way Memorandum in Appendix P, State Plan Policies and Procedures Manual (SPM).

2. Explain the content of this change to the State designees as required.

3. Ensure that the State shall respond to this change within 70 days in accordance with paragraph I.1.a.(2)(a) and (b), Chapter III. The State shall submit the plan supplement within 6 months in accordance with I.1.a.(3)(c), Chapter III.

4. Ensure that the State's acknowledgement include:

a. The State's plan to adopt and implement identical criteria for identifying industries and establishments to be scheduled for programmed safety and/or programmed health inspections;

b. The State's plan to develop/utilize alternative criteria to those contained in the instruction, which are as effective; or

EXHIBIT 1 C

     c. The reasons why no change is necessary for the State to maintain a program which is as effective.

    5. Advise the State designees that the State specific targeting list will be available through the IMIS and that the establishment lists will be in random order for the top 200 industries. Those States who wish the lists to be in rank order should contact the Office of Statistics, (202) 219-6466.

    6. Review policies, instruction and guidelines issued by the State to determine that this change has been communicated to State compliance personnel.

## H. Changes for FY 1995.

    1. For safety, national BLS Lost Workday Injury and Illness data are used to rank industries at the 4 digit SIC Level. The data are for Calendar year 1992, the most recent that BLS has published. National data are used because BLS no longer supplies OSHA with the state data. (See B.1.a.(1)(a) and B.1.b.(1)(a)1).

    2. For safety and health, deletion criteria is extended to 5 years for a complete inspection. Previous deletion criteria was 2 years for safety and 3 years for health. (See B.1.b.(1)(b)6b)

    3. For both safety and health, establishment lists are in random order and contain all the establishments in the top 200 industries. The establishments in the top 100 industries are given two chances to rank high on the list. That is, for safety all the establishments within the 200 industries with the highest lost workday injury and illness rates are placed in random order with the top 100 industries twice as likely to rank high. For health all establishments within the 200 industries ranked by serious health violation per inspection are placed in random order with the top 100 industries twice as likely to rank high. The establishments are selected for inspection in this random order. (See B.1.a.(2)(b) and B.1.b.(1)(b)4)

    4. Small employers that are part of another employer are included on the lists. Some employers with sizable employment appear on the Dun and Bradstreet (D&B) list as having no employment. This is because some corporations report corporation employment to Dun and Bradstreet and do not separate the employment by worksite. The small employers will have a small employer deletion code of 'T0' which needs to be removed if the employer is to be inspected. (See B.1.b.(1)(b) NOTE #2 and B.1.b.(1)(b)6bT#)

    5. The issuance of this instruction authorizes the termination of the use of inspection cycles created using the FY 1994 planning guide. No unscheduled establishments are to be carried over to the FY 1995 cycles.

Joseph A. Dear Assistant Secretary

DISTRIBUTION: National, Regional, and Area Offices All Compliance Officers State Designees NIOSH Regional Program Directors 7(c)(1) Project Managers

SCHEDULING SYSTEM FOR PROGRAMMED INSPECTIONS

## A. Program Planning.

    1. **Purpose.** Scheduling System for Programmed Inspections provides general guidelines to the Regional Administrator and Area Director in planning compliance operations and related activities and instructions for their implementation.

    2. **Primary Consideration.** The primary consideration in conducting compliance operations is the attainment of maximum effective inspection coverage. To achieve this goal, the guidelines in this chapter shall be used for scheduling inspections.

## B. 1. **Programmed Inspections.** A programmed inspection generally is a

    comprehensive inspection of the worksite but may be limited as necessary in view of resource availability and other enforcement priorities such as focused inspections. (Low hazard areas, such as office space, may be excluded from inspection without affecting the comprehensiveness of the inspection.)

    a. **General.** Certain considerations are fundamental to the implementation of OSHA's targeting system. The word "host" refers to the computer system used by the National Office and the word "micro" refers to the computer system used in each Area/District Office.

       (1) **Policy.** It is OSHA policy that inspections conducted as programmed inspections be primarily in the "high hazard" sectors of employment.

        (a) In the area of safety, the Agency considers a "high hazard" industry to be one within a Standard Industrial Classification (SIC) code with a National lost workday injury and illness rate among the highest 200 as published for calendar year 1992 by the Bureau of Labor Statistics (BLS) at the 4-digit SIC level. The 1992 data are the most recently published data by BLS.

        (b) In the area of health, the agency considers a "high hazard" industry to be one with a previous history of serious OSHA health citations.

        (c) For the purpose of scheduling programmed inspections, construction and maritime are considered to be categories of high hazard employment.

        (d) Other specific industries, such as logging, and oil and gas extraction, are also high hazard industries and are frequently scheduled for inspection as special emphasis programs.

       (2) **Description.** Both programmed safety inspections and programmed health inspections are scheduled using a multiple-step process.

B. 1. a. (2) (a) The initial selection of a particular category of

    employment (e.g., Federal Agency, high rate general industry, construction, maritime, or high

CPL 02-00-025 - CPL 2.25I - Scheduling System for Programmed Inspections

hazard health) is made with current agency policy and with actual numbers of planned inspections taken from the annual Field Operations Program Plan projections made at the Area Office level, reviewed at the Regional and National Office levels and approved by the Assistant Secretary. (See OSHA Instruction PAE 1.1C.)

(b) Within a category establishments are grouped by some criteria such as industry and priority is established by grouping. Within the grouping establishments are selected for inspection and placed in an inspection cycle.

**1** For Federal Agencies, the priority is based on the Lost Time Claims Rate (LTCR) List based on the Office of Worker Compensation Programs LTCR and a list of targeted agencies will be supplied by the National Office after consultations with the Regional Administrator and the agency DASHO. (See Chapter XIII of OSHA Instruction CPL 2.45B, or superseding directive.)

**2** For General Industry safety, the priority is based on the Lost Workday Injury and Illness Rate by industry and the list of establishments within these industries will be provided by the National Office. Establishments on the list are those within the top 200 industries and are placed in random order with weighing factor applied so that establishments in the top 100 are twice as likely to place high on the random ordered list. The list is provided by the National Office in four sublists.

**3** For General Industry health, the priority is based on the number of serious health violations per health inspection by industry and the list of establishments within these industries will be provided by the National Office. Establishments on the list are those within the top 200 industries and are placed in random order with weighing factor applied so that establishments in the top 100 are twice as likely to place high on the random ordered list. The list is provided by the National Office in four sublists.

**4** For Construction, the universe of active construction sites is maintained by the Construction Resource Analysis (CRA) group at the University of Tennessee. Each month CRA randomly selects active worksites for inspection. Each area office receives the list from CRA and the OSHA Construction Inspection Reports for each site from F. W. Dodge.

**5** For Low Rate Manufacturing and Nonmanufacturing safety, the National Office supplies a list of establishments randomly selected from those available in each category and the Planning Guide software randomly selects the number needed from this list based on a 90/5/5 split among high rate manufacturing/low rate manufacturing/ non-manufacturing.

B. 1. a. (2) (c) Where no establishment list is provided by the

National Office (e.g., maritime and logging categories), the Area Director shall compile a complete list of active establishments (worksites) considering all establishments (worksites) within the coverage of the office and using the best available information (commerce directories, commercial telephone listings, local permits, local knowledge, etc.). From this list worksites for inspection will be selected randomly.

b. **Guidelines and Procedures.** Programmed inspections shall be conducted jointly by both safety and health personnel whenever resources are available and it is likely, based on experience in inspecting similar workplaces, that both safety hazards and health hazards exist to a significant degree. If an inspection is begun as safety only or as health only but the CSHO determines during the course of the inspection that it should be expanded, the CSHO shall make a referral as appropriate.

NOTE: Establishments which appear on both the safety and health registers should be scheduled for a joint safety/health inspection whenever practicable. (See B.1.b.(1)(e)**1g**.)

(1) **Inspection Scheduling for General Industry (Safety & Health).** The following procedures are to be adhered to in programming General Industry safety and health inspections.

NOTE: Federal Agency Program targeted inspections and onsite evaluations have a priority equal to that of private sector general industry programmed inspections. The scheduling system for these inspections is outlined in Chapter XIII, of OSHA Instruction CPL 2.45B, or superseding directive.

(a) **Industry Rank Report.** The National Office shall provide each Area/District Office with a Statewide Industry Rank Report (SIC List), listing industries by their 4-digit Standard Industrial Classification (SIC) codes where available. These lists are sent electronically at the beginning of each fiscal year. Ranks are assigned based on the priority criteria described above. (See Appendix A and B, and also ADM 1-1.30.)

**1** The Safety SIC List is a statewide listings of industries with the highest Lost Workday Injury and Illness Rates. A list is provided with the top 200 safety industries ranked by the industry's National Lost Workday Injury and Illness Rate. The National Lost Workday Injury and Illness Rates are estimated from the Bureau of Labor Statistics (BLS) annual survey at the 4-digit SIC level industry. The 1992 data are the most recently published data by BLS. Two lists are provided, one in SIC order and the other in Lost Workday Injury and Illness rate order from highest to lowest.

**2** The Health SIC List is a statewide listing of industries with high average numbers of serious (willful and repeat) health violations per inspection. A list is provided with the top 200 health industries ranked by the industry's average number of serious health violations per inspection. The average number of serious health violations per inspection is calculated by dividing the number of serious health violations for the previous five calendar years in the industry by the number of health inspections conducted in the industry. Two lists are provided, one in SIC order and the other in serious health violations per inspection order from highest to lowest.

B. 1. b. (1) (b) **Establishment Lists.** The National Office

will also provide a series of establishment lists (in random order) from the host for use by the Area

Office in programming inspections. These lists are provided electronically when needed.

**1 Data Processing Issues - Random Order.** The establishments are placed in random order at the host using the following procedure. Each establishment in the top 200 industries is assigned a random decimal number between 0 and 1. Establishments in industries ranked 1 to 100 are given two random numbers with the larger number selected and assigned to the establishment. The list is sorted from largest to smallest random number. The resulting establishment list is in random order with the establishments in industries in the top 100 given two chances to place high on the list.

**a** For the purpose of downloading the appropriate number of establishments for each office, the list for each office is divided into four sublists each containing about one quarter of the firms on the list.

**b** No additions should be made to the establishment lists because the lists are a random ordering of all the establishments in the top 200 safety industries and the top 200 health industries. All the firms within an industry may not be in the sublist of establishments downloaded to the micro computer. Only after all four sublists are downloaded are all the establishments for all industries present on the micro computer.

**c** Establishments with 10 or fewer employees and that are not part of a larger employer will be deleted from establishment lists provided by the National Office. Establishments with 10 or fewer employees and that are a part of a larger employer will have a deletion code of 'TO'. Some establishments showing no employment on the employer file are locations of larger corporations that do not report their employment to Dun & Bradstreet for each location.

**d** Because the existing software on the micros is limited to three-digit rank values, any establishment list with more than 999 establishments is renumbered, with the result that more than one establishment may share the same rank number. For example, on an establishment list of 2400 establishments, the first three establishments will be given rank value "1", the second three establishments given rank value "2", and so on. The rank value on the micros will be used for the random ordering of the establishment list. In the past the rank value had been used to provide a reference to the Industry rank report. The planning guide software will randomly select when there are firms of the same rank and not all are selected.

B. 1. b. (1) (b) **2 High Rate Establishment List for Safety.**

A list of establishments located within the Area/District Office jurisdiction for each SIC code on the High Rate SIC List (the top 200 safety industries) will be provided by the National Office as available to all Area/ District Offices. This list will be in random order. The list is divided into four sublists and made available electronically to all Area/District Offices. (See Appendix B and Chapter X of OSHA Instruction ADM 1-1.30.)

**3 Low Rate Establishment List for Safety.** A list of randomly selected establishments in industries not included in the top 200 safety industries located within the Area/District Office jurisdiction will be provided by the National Office to all Area/District Offices. A randomly selected pool of these establishments is included in each sublist of establishments made available electronically to all Area/District Offices. (See Chapter X of OSHA Instruction ADM 1-1.30.)

**4 Nonmanufacturing Establishment List for Safety.** A list of establishments randomly selected from industries with SIC codes in the range 4000 through 8999 and located within the Area/District Office jurisdiction will be provided by the National Office to all Area/District Offices. A randomly selected pool of these establishments is included in each sublist of establishments made available electronically to all Area/District Offices. (See Chapter X of OSHA Instruction ADM 1-1.30.)

**5 Health Establishment List.** A list of establishments located within the Area/District Office jurisdiction for each SIC code on the Health SIC List will be provided by the National Office to all Area/District Offices. This list will be in random order. The list is divided into four sublists and made available electronically to all Area/District Offices. (See Appendix A and Chapter X of OSHA Instruction ADM 1-1.30.)

**6 Adjustments.** Prior to use of establishment lists provided by the National Office for scheduling purposes, the Area Director shall make appropriate deletions as follows:

**a** IMIS Codes for deletions are also found in Chapter X, Table I, Update Codes of OSHA Instruction ADM 1-1.30. Deletions may be applied to the inspection register (as defined in B.1.b.(1)(c)). The planning guide software selects the appropriate number of establishments for low rate manufacturing and nonmanufacturing for each safety cycle.

B. 1. b. (1) (b) 6 b Only establishments with an out

of business deletion code will be deleted by the National Office. All establishments with valid deletion codes will be downloaded with their deletion codes.

**c Additions.** The lists are in random order. No additions should be made to the lists. When an establishment is identified for addition to the list, it should be sent to the National Office for inclusion in next year's list. For use by State Plan States, the following updated code is available for adding establishments to the list:

**Code Description**

AA When information received from local sources reliably indicates that an establishment is classified within a SIC code on one of the SIC Lists but does not appear on the corresponding

establishment list provided. Additions shall be placed on the proper SIC List in accordance with the listing criterion used; e.g., alphabetically, by size, etc.

**d Deletions.** The following deletion codes shall be used to update establishment lists. Deletions for any other reason shall be requested from the Regional Administrator and approved by the Director of Compliance Programs.

EXCEPTION: Approval from the National Office is not required when the deletion code is used to eliminate duplicate listings or when establishments are not within OSHA's jurisdiction.

| Activity Code | Description (# = last digit of the fiscal year) |
|---|---|

A# Activity ceased or process not active.

B# Business Closed--Establishment is no longer in business.

C# Consultation--Establishment has been approved for exemption from inspection through consultation.

H# Health inspection--A substantially complete or focused health inspection was conducted within the current or previous five (5) fiscal years with no serious violations cited; or, where serious violations were cited, an acceptable abatement letter or a followup inspection has documented "good faith" efforts to abate all serious hazards.

I# Incorrect SIC code--The correct SIC code for the establishment is not on the current Safety High Rate SIC List or the current Health SIC Lists. This deletion also applies when the correct establishment SIC code is not on the Low Hazard SIC List when used for scheduling according to B.1.b.(1)(e)4a (i.e., when the correct SIC code is a nonmanufacturing code).

B. 1. b. (1) (b) **6 d** EXAMPLES: Establishment is

listed under an incorrect SIC code which is on the High Rate SIC List but the correct SIC code for the establishment is not on the High Rate SIC List.

Establishment is listed in a SIC code which was on the High Rate SIC List for the fiscal year in which the Inspection Register was made up initially, but is no longer on the High Rate SIC List at the time the inspection is scheduled.

NOTE: If an establishment is listed on the Low Hazard or the Nonmanufacturing Establishment List for Safety under an incorrect SIC code, the establishment shall not be deleted from those lists. Its selection is random and will fit in wherever its real SIC code places it.

J# Jurisdictional error--Not within Area Office geographic area or jurisdiction.

L# Location of establishment--Could not be found.

O# Other reasons for deletion not listed above. Approval for deletion shall be requested from the Regional Administrator and approved by the Director of Field Operations.

P# Plant office or headquarters-- Nonplant facility.

S# Safety inspection--Any comprehensive programmed or focused safety inspection or a substantially complete unprogrammed safety inspection conducted within the current or previous five (5) fiscal years.

T# Ten or fewer employees -- Establishments with 10 or fewer employees and are part of larger employers will be included in the employer lists supplied by the National Office. These employers will be coded `TO' by the National Office.

V# Voluntary protection program participation approved. Establishment has been approved to participation in the voluntary protection program.

W# Reserved.

Y# Carryover

B. 1. b. (1) (c) **Inspection Register**. After all the

appropriate changes are made, the Area Office inspection registers shall be made up by determining which establishments are to be scheduled for inspection during the current fiscal year. The number of projected programmed inspections is taken from the revised OSHA-146 Form (OSHA-146 EZ). This number shall be adjusted to reflect the number of planned inspections in each category that are expected to be done in the next year. The number of carryover establishments shall be subtracted to determine the number of establishments required to meet the projected number.

**1** The General Industry Safety Inspection Register shall consist of the following elements:

**a** Up to five percent of the total number of projected programmed high hazard safety inspections to be conducted shall be scheduled from the Low Hazard Establishment List;

**b** Up to five percent of the total number of projected programmed high hazard safety inspections to be conducted shall be scheduled from the Nonmanufacturing Establishment List;

NOTE: Since a fractional establishment cannot be inspected, five percent should be read to mean up to, but not exceeding five percent. If, for example the total number is 50, five percent would be 2.5, but only 2, not 3, establishments should be inspected.

**c** Ninety percent of the total number of projected programmed high hazard safety inspections shall be selected in rank order from the High Hazard Establishment List, for the purpose of inspection scheduling.

**2** The Health Inspection Register shall consist of the total number of projected programmed health inspections selected in random order from the Health Establishment List.

**3** The inspection registers, together with adequate documentation on all additions, deletions, or other modifications, shall be maintained in the Area Office for 3 years following their completion. (See OSHA Instruction ADM 12.5 Appendix F, A.1. and B.1., Records Disposition Schedule NC1-100-82-1, Item 1a.)

B. 1. b. (1) (d) **Inspection Cycle.** An inspection

cycle is a group of establishments which have been selected for inspection. The cycle has two characteristics: 1) once started all establishments within the cycle must be inspected, and 2) the establishments within the cycle may be inspected in any order. Ideally, the size of the cycle should be such that all establishments will be inspected during the course of the fiscal year and there would be no carry over. It is best to estimate a cycle size of sufficient size to last 10 to 12 months. If the cycle is not large enough to cover the entire fiscal year, when it is about to be finished another cycle can be chosen that is of a size to cover the balance of the fiscal year. The next year's cycle will be selected from next year's register which will have refreshed data.

(e) **Inspection Scheduling.** Within a cycle, establishments may be scheduled and inspected in any order that makes efficient use of available resources.

**1** Each inspection cycle shall be completed before another cycle is begun. The only exceptions are as follows:

**a** An establishment may be carried over to another cycle if the establishment is not operating normally because of strikes, seasonal fluctuations, or other factors.

**b** An establishment may be carried over to another cycle if necessary equipment or personnel with necessary experience and qualifications to perform the inspection are not presently available.

**c** An establishment may be carried over to another cycle if it is the last remaining establishment in a cycle, its inspection would require travel in excess of 50 miles and it cannot be combined with other inspection activity.

**d** An establishment may be carried over to another cycle if the employer has not yet completed abatement action required as a result of a previous comprehensive OSHA inspection of the same inspection type (safety or health) because the final abatement date has not yet come.

**e** An establishment may be carried over to another cycle if the employer has contested a citation item issued as a result of a previous OSHA inspection and the case is still pending before the Review Commission.

**f** An establishment may be carried over to another cycle if the inspection cannot be completed due to the employer's refusal to allow the inspection.

B. 1. b. (1) (e) **1 g** An establishment may be

carried over to another cycle if the inspection must be deferred because of the presence of a at the worksite or because the establishment has applied has not yet been approved in the Inspection Exemption through has has Consultation Program or a Voluntary Protection Program which carries a temporary exemption from inspection.

**h** Approval for carrying over an establishment for reasons not listed above must be requested from the Regional Administrator and approved by the Director, Office of Field Programs.

NOTE: Although the Area Director is authorized to carry over inspections to another cycle for the reasons given in this subparagraph, in most cases there is no requirement to do so.

**o** There may be good reasons for not carrying an establishment over to another cycle; in that case, the Area Director is free to schedule the inspection.

**o** If an inspection is conducted rather than carried over and if there are items under contest or with an abatement date that is still open, those items shall be excluded from the scope of the inspection unless monitoring of abatement is required; e.g., pursuant to a settlement agreement. (See OSHA Instruction CPL 2.90.)

**2** As previously described, the inspection cycle is established with the number of projected at the beginning of the fiscal year. Number of inspections actually performed, however, will depend on factors such as staffing, unprogrammed inspection activity and special programs. If all establishments in the inspection cycle are inspected before the end of the fiscal year, another cycle shall be prepared by extending the inspection register. The number of establishments on this

inspection cycle will be equal to the estimate of the number of inspections that the Area Office projects it can conduct prior to the end of the fiscal year. The planning guide software will give the 90/5/5 split for high hazard, low hazard and non- manufacturing as each cycle is generated.

**a** If all establishments in the current cycle are inspected before the end of the fiscal year, another cycle shall be prepared by extending the inspection register to the next group consecutively numbered establishments on the high hazard list and randomly generated low hazard and non-manufacturing establishments.

B. 1. b. (1) (e) **2 b** The number of establishments on

the extended inspection register will be equal to an estimate of the number of inspections that the Area Office projects it can conduct prior to the end of the fiscal year.

**3** Any cycle begun but not yet completed at the end of the fiscal year shall be completed, subject to the exceptions set forth in B.1.b.(1)(e)1, before beginning the new fiscal year inspection cycle. The number of inspections yet to be completed shall be taken into account in setting the new fiscal year inspection cycle.

**4** In the event that inspections have been conducted in all eligible establishments on the Establishment Lists received from the National Office before completing the planned number of inspections, the Area Director shall:

**a** For safety, request from the National Office, through the Regional Administrator, additional establishments from the Low Hazard Establishment List, selected in rank order, making appropriate adjustments, according to B.1.b.(1)(b)5.

**b** For health, request from the National Office, through the Regional Administrator, a list of additional establishments within the next group of targeted health SIC codes.

(f) **Deletions**. Once the inspection cycle itself begins, the following policy shall guide deletions:

**1** An establishment shall be deleted from an inspection cycle whenever one of the criteria form deletion becomes applicable. For example, an establishment may be out of business or inactive.

**2** Where it is learned only after the compliance officer has arrived at the establishment that one of the criteria for deletion applies, the inspection shall not be conducted (or continued if already begun). Citations for the completed portion of the inspection shall still be issued, unless the establishment has fewer than 11 employees and the SIC code is exempted. (See OSHA Instruction 2.51H, or most current version, memorandum dated June 1994 with new appendixes.)

**3** If the CSHO learns after arrival that the establishment has been classified in the wrong SIC code, but the correct SIC is on the safety or the health SIC list, the CSHO shall conduct the inspection at that time. Otherwise, the inspection shall be deferred.

**Note: This section has been cancelled by CPL 02-00-155.**

~~B. 1. b. (2) Inspection Scheduling for Construction.~~

~~Due to the mobility of the construction industry, the transitory nature of construction worksites and the fact that construction worksites frequently involve more than one construction employer, inspections shall be scheduled from a list of construction worksites rather than construction employers. The National Office will provide to each Area/District Office a randomly selected list of construction projects from all covered active projects. This list should contain the projected number of sites the office plans on inspecting in the next month.~~

~~B. 1. b. (2) (a) Inspection List. OSHA has~~

~~contracted with F.W. Dodge and the Construction Resources Analysis (CRA) group of the University of Tennessee. Each month F.W. Dodge will provide to CRA information on construction projects which are expected to start in the next 60 days. CRA adds to the Dodge data a time period when each project is active and maintains a file containing all active construction projects. From active construction projects, CRA will generate monthly for each Area Office a randomly selected construction inspection list based upon:~~

~~1 Counties located within Area Office boundaries;~~

~~2 Estimated number of worksites to be inspected during the monthly scheduling period (to be determined by the Area Director);~~

~~3 The selection criteria are to be determined by the Area Director based on local conditions, approved by the Regional Administrator, and provided to CRA for entry into the system. These selection criteria may be designed to include any class of worksites within the computerized selection process. Some examples of such criteria are:~~

~~a A minimum dollar value of the construction project.~~

~~b Specific stages of construction project (in percent complete).~~

~~c Specific types of construction projects.~~

~~(b) OSHA Construction Inspection Reports. CRA will order appropriate OSHA Construction Inspection Reports, corresponding to the sites on the randomly selected list for each Area Office.~~

(c) Limitation on Frequency of Selection. Normally, no site shall be selected for inspection more frequently than once per trimester. Therefore, CRA will remove from its master files any project selected for an inspection for a period of four months and reenter it in the fifth month if it is still active. Thus, if a list is not used, CRA should be notified so those sites will be returned to available status. Refer to paragraph B.1.b.(2)(d)4 for return procedures.

(d) Scheduling Cycle. The scheduling period (cycle) for construction inspections shall be one calendar month. Each month, each Area Office will receive its programmed construction inspection list from CRA. Within the following 10 days it will receive the OSHA Construction Inspection Reports corresponding to the sites on the inspection list. Offices receiving 10 or fewer OSHA Construction Inspection Reports will receive them by FAX. This list will be dated the following month. It can be used when received and should be completed by the end of the month it is dated. The use of the current list is important because conditions change rapidly and the lists become outdated. The best planning strategy is to receive from CRA the required number of sites for the month to ensure that the most current list is always being used.

B. 1. b. (2) 1 All sites on the inspection list

shall be inspected, and the sites can be scheduled in any order to make efficient use of resources.

2 Complaints shall be treated in accordance with Chapter I, C. of OSHA Instruction CPL 2.103. All other information indicating the possible need for a construction inspection at a specific worksite shall be treated as a referral, also in accordance with Chapter I, C. of OSHA Instruction CPL 2.103.

3 The Area Office shall make no deletions from the inspection list, except where the Area Director documents that:

a Little or no construction activity at a worksite on the list has begun or construction activity has already been substantially completed before an inspection can be made.

b A worksite has become ineligible for any reason; e.g., where a substantially complete inspection of the worksite has been conducted as a result of a complaint investigation.

c A worksite has been approved for exemption from inspection through consultation or for participation in the voluntary protection program.

4 If a new list is received and it is anticipated that it will not be used because of a large number of sites remaining on the current list, the CRA shall be notified directly by the Area Office by FAX or phone as soon as practicable so that the unused sites may be restored to be eligible for possible selection on the next list. The unused list shall be marked as such and retained in the scheduling file. (See B.1.b.(2)(g)1.)

(e) Completion of Inspection List. By the middle of each cycle, the Area Director shall assess progress in inspecting all sites on the list in order to plan resources for the following cycle.

1 If it appears that not all sites on the list will have been inspected by the end of the month, the Area Director may request a shortened list from CRA for the following month through the Assistant Regional Administrator for Federal-State Operations.

B. 1. b. (2) (e) 2 If it appears that all sites on the list

will have been inspected by the end of the third week of the month, or if fewer employers are inspected than originally the Area Director may request a supplemental inspection list from CRA through the Assistant Regional Administrator for Federal-State Operations.

3 Consecutive months' lists may be combined and used concurrently. However, all sites from the first month of a combined list shall be inspected before worksites from the second month's list are combined with a third month, except when a site is carried over as described at B.1.b.(2)(f) below. That is, list for two consecutive months can be combined to form one combined cycle; but the first month's list must be completed or classified as carryover before the second month's list can be combined with the third month's list and so on.

(f) Carryovers. Worksites on one inspection list may be carried over to the next cycle only under the following circumstances:

1 A worksite may be carried over to the next cycle if it is not operating normally at the time of the inspection because of personnel strikes, environmental conditions or other factors.

2 A worksite may be carried over to the next cycle if necessary equipment or personnel with experience and qualifications to perform the inspection are not presently available.

3 A worksite may be carried over to the next cycle in the interest of efficient use of resources. The number of such carryovers may not exceed 25% of the total number of sites on the original cycle. Any worksite carried over in this manner may not be carried over a second time.

4 A worksite may be carried over to the next cycle if the inspection cannot be completed due to the employer's refusal to allow it.

5 A worksite may be carried over to the next cycle if conditions (construction activity at the site) have not changed substantially since a prior inspection.

6 A worksite may be carried over to the next cycle if the inspection must be deferred because of the presence of a consultant at the worksite.

~~7 Approval for carrying over a worksite for reasons not listed above must be requested from the Regional Administrator and approved by the Director of Field Programs.~~

~~NOTE: Although the Area Director is authorized to carry over inspections to another cycle for the reasons given in this subparagraph, there is no requirement to do so. There may be good reasons for not carrying a worksite over to another cycle; in that case the Area Director is free to schedule the inspection.~~

~~B. 1. b. (2) (g) Area Director Administration of Inspection~~

~~List. The Area Director shall be responsible for maintaining documentation of the construction inspection list and for ensuring that selection criteria are current and appropriate:~~

~~1 The monthly construction inspection lists received from CRA and the corresponding OSHA Construction Inspection Reports shall be maintained in the Area Office for a period of 3 years after completion of the cycle whether they are used or not. (OSHA Instruction ADM 12.5 OSHA Compliance Records, Records Disposition Schedule NC1-1000-02-1; Item 1a.)~~

~~2 If circumstances indicate a need to modify the Area Office's selection criteria on file with CRA, the Area Director shall contact the Assistant Regional Administrator for Federal-State Operations. All modifications to the Area Office's selection criteria shall be approved by the Regional Administrator and shall be effective for the month following entry into the computer if recieved by the 23rd of the month.~~

~~(h) Health Construction Inspections. No seperate scheduling method is applied for programmed construction health inspections. Rather, the Area Director shall determine which construction inspections are to be conducted as a joint inspection where serious health hazards are likely to exist at the site. A local emphasis plan may be submitted and approved for scheduling health construction inspections.~~

**B. 1. b. (3) Inspection Scheduling for Maritime.**

The maritime industry is made up of several industrial activities and, due to the unique differences among the industries, several scheduling methods are necessary. Consequently, maritime inspections shall be scheduled either as local emphasis programs as outlined in B.1.b.(4) or as follows:

**(a) Maritime Industries Scheduled With General Industry Inspections.** All fixed maritime (shipyard) establishments listed on the safety or the health inspection registers for each Area Office shall be scheduled and inspected with General Industry as outlined in B.1.b.(1).

**(b) Maritime Inspections Scheduled With Construction.** Maritime construction shall be scheduled with other construction inspections as outlined in B.1.b.(2).

**(c) Water Transportation Services (Longshoring, Marine Terminals, Voyage Repair).** Because of differences in conducting water transportation services operations in a large port, where, for example, many stevedores generally conduct longshoring operations, and on rivers and other waterways, where loading and unloading by a single employer is generally involved, water transportation services inspections may be scheduled either by port area or by employer.

**B. 1. b. (3) (c) NOTE #1:** The method of selection shall

be determined at the beginning of each fiscal year by each Area Director, based on the type of water transportation services activities within the Area Office jurisdiction and on the ability to identify active employers and their worksites. The selection method shall be approved by the Regional Administrator.

NOTE #2:    Inspections may be scheduled by employer in large ports when the Area Director is able to identify **all** of the employers (stevedores) working within the port and, when a particular employer is to be inspected, **all** active worksites (vessels) of that employer.

NOTE #3:    All marine terminals, which may be associated with a port area or with an employer, and all voyage (mobile, nonfixed or dockside) ship repair operations which may be under way at the time of the scheduled water transportation services inspection shall be inspected along with the inspection of all active longshoring operations.

**1 Inspection List.** This list shall consist of the worksites from which water transportation services inspections will be scheduled. It may be constructed in either of two ways:

**a By Port Area.** A list of Port Areas shall be prepared at the beginning of the fiscal year by the Area Director, using OSHA inspection history, local knowledge and experience, company

schedules, and information from other sources.

EXAMPLES: The port of Savannah might be subdivided into three Port Areas; the port of Houston might be subdivided into eight or more Port Areas. Other large ports may be subdivided in the same manner.

(i) The list shall be arranged alphabetically by port and within each port by Port Area (location name).

(ii) This list shall be reviewed and revised as necessary each year and submitted to the Regional Administrator for approval.

(iii) The Area Director shall use the Port Area List to prepare a list of all stevedores, marine terminals, and ship-building and repair employers working each Port Area. All of these employers who are actively working in the Port Area at the time of the scheduled inspection of the Port Area shall be included in the programmed inspection of the Port Area. (See, however, B.1.b.(3)(c)5a.)

B. 1. b. (3) (c) 1 a (iv) No employer shall be

inspected at more than one worksite (vessel) during any Port Area inspection except for imminent danger reports, fatalities, formal complaints and referrals.

(v) Port Areas which have received a substantially complete inspection within the preceding quarter (i.e., at least one worksite was inspected of each employer working a Port Area at the time of the scheduled inspection) shall be deleted from the Port Area List for the next quarter.

b By Employer. A list of all water transportation services employers within the Area Office jurisdiction shall be prepared, based on OSHA inspection history, local knowledge and experience, company schedules, and other sources.

(i) If all employers identified are programmed for inspection within a cycle, no additional selection procedure is necessary except as outlined in B.1.b.(3)(c)5.

(ii) If not all employers are to be inspected, the list shall be arranged alphabetically by employer name and by location.

(iii) Employers who have received a substantially complete inspection in the previous fiscal year shall be deleted from the list for the next fiscal year unless all employers on the list received such an inspection.

(iv) The list of employers shall be reviewed and revised as necessary each year and submitted to the Regional Administrator for approval initially and whenever revised.

2 Numbering of List. After a list of Port Areas or a list of employers has been prepared and adjusted as necessary, the list is sorted alphabetically by name and location and each Port Area or each employer on the list shall be numbered consecutively, beginning with the number 1.

3 Quarterly Inspection Cycle for Port Areas. The number of quarterly inspection is estimated using the number of water transportation services inspections projected for the year on the OSHA-146 EZ Form and divide by 4, a quarterly inspection cycle shall be prepared as follows:

B. 1. b. (3) (c) 3 a Apply the random number table to

the Port Area List which has been prepared as directed in B.1.b.(3)(c)2 a.

b Select Port Areas in the order prescribed by the random numbers until the number of inspections estimated (i.e. total number of employers) at least equals the number of inspections projected for the fiscal year.

4 Annual Inspection Cycle for Employers. Using the number of water transportation services inspections projected for the year in the OSHA-146 EZ Form, one annual inspection cycle shall be prepared as follows:

a Apply the random number table to the Employer List which has been prepared as directed in B.1.b.(3)(c)2b.

b Select employers in the order prescribed by the random numbers until the number of inspections estimated at least equals the number of inspections projected projected for the fiscal year.

c Random numbers would not be used if all employers on the list are to be inspected.

5 Inspection Scheduling. Within a cycle Port Areas or employers may be scheduled and inspected in any order that makes efficient use of available resources.

a When scheduling workplaces in a larger port either by Port Area or by employer in accordance with B.1.b.(3)(c)1a or c and all active workplaces of the scheduled employer are not to be inspected, the Area Director may select any of the active workplaces for inspection. Due consideration shall be given to resource availability, size and type of project involved, previous activity at the various locations, the potential presence of other related activities such as terminal operations and dockside repair activities, and other relevant factors in selecting the particular worksite(s) to be inspected.

b Each inspection cycle shall be completed before the next cycle is begun. The only exceptions are

as follows:

(i) A worksite may be carried over to the next cycle if it is not operating normally because of strikes, or other factors.

(ii) A worksite may be carried over to the next cycle if necessary equipment or personnel with experience and qualifications to perform the inspection are not presently available.

B. 1. b. (3) (c) **5 b** (iii) A worksite may be carried

over to the next cycle if its inspection would require travel in excess of 50 miles and it cannot be combined with other inspection activity.

(iv) (NOT FOR PORT AREAS) An employer may be carried over to another cycle if the employer has not yet completed abatement action required as a result of a previous comprehensive OSHA maritime inspection of the same inspection type (safety or health) because the final abatement date has not yet come.

(v) (NOT FOR PORT AREAS) An employer may be carried over to another cycle if the employer has contested a citation or a citation item issued as a result of a previous OSHA inspection of the same inspection type (safety or health) and the case is still pending before the Review Commission.

(vi) A worksite may be carried over to the next cycle if the inspection cannot be completed due to the employer's refusal to allow it.

(vii) A worksite may be carried over to another cycle if the inspection must be deferred because of the presence of a consultant at the worksite or because the worksite is a participant in the Inspection Exemption through Consultation Program or a Voluntary Protection Program which carries a temporary exemption from inspection.

(viii) Approval for carrying over a worksite for reasons not listed above must be requested from the Regional Administrator and approved by the Director of Compliance Programs.

NOTE: Although the Area Director is authorized to carry over inspections to another cycle for the reasons given this subparagraph, there is no requirement to do so. There may be good reasons for not carrying a worksite over to another cycle; in that case the Area Director is free to schedule the inspection.

**c** If all Port Areas in the quarterly inspection cycle or all employers in the annual cycle have been inspected but fewer employers are inspected than originally predicted, additional Port Areas or employers shall be selected appropriate list, using the order prescribed by the random numbers, until the additional number of inspections at least equals the number of inspections still needed to meet the number of inspections projected for the quarter or the year.

B. 1. b. (3) (c) **5 d** Similarly, if the Area Office is

able to do more programmed water transportation services inspections than the number of inspections projected at the beginning of the year, additional Port Areas or employers shall be scheduled for inspection in the order prescribed by the random numbers.

**e** At the end of a fiscal year the number of inspections yet to be completed in that cycle shall be taken into account in setting the new inspection cycle.

EXAMPLE: At the end of fiscal year an Area Office has 2 maritime employers left to inspect. If the projected number of water transportation services inspections for the new fiscal year is 10, the new list shall be used to select 8, rather than 10, maritime employers.

**6 Deletions.** After the beginning of an inspection cycle, a Port Area or employer shall be deleted from the inspection cycle if a substantially complete inspection of the Port Area or the employer has been conducted during an unprogrammed inspection.

NOTE: This paragraph does not preclude further unprogrammed inspections conducted in response to specific evidence of conditions involving imminent danger or serious hazards at a worksite, such as those obtained through direct observations. These instances shall be evaluated by the Area Director and, if appropriate, investigated as referral inspections.

**7 Other Maritime Industry Inspections.** Maritime industries not covered by one of the above scheduling programs shall be scheduled as local emphasis programs under the Special Emphasis Programs procedures outlined in B.1.b.(4).

**8 Health Maritime (Construction and Water Transportation Services) Inspections.** No separate method is applied for programmed maritime health inspections. Rather, the Area Director shall determine which maritime inspections are to be conducted as joint inspections because serious health hazards are likely to exist at the worksite, or scheduled as a local emphasis program.

**(4) Special Emphasis Programs.** Special Emphasis Programs provide for programmed inspections of establishments in industries with potentially injury or illness rates which are not covered by the scheduling systems outlined in the preceding subsections of B.1.b. or, if covered, are not addressed to the extent considered adequate under the specific circumstances present. Special emphasis programs may also be used to set up alternative scheduling procedures or other departures from national procedures. They include National Emphasis Programs and Local Emphasis Programs (See OSHA Instruction CPL 2.102).

B. 1. b. (4) (a) **Description**. The description of and the

reasons for specific National Emphasis Programs will be set forth in appropriate instructions or notices as the occasion arises. Local Emphasis Programs may be developed by the Area Office or by the Regional Office, depending on the matter addressed.

**1** The description of the particular Special Emphasis Program shall be identified by one or more of the following:

**a** Specific industry.

**b** Trade/craft.

**c** Substance or other hazard.

**d** Type of workplace operation.

**e** Type/kind of equipment.

**f** Other identifying characteristic.

**2** The reasons for and the scope of a Special Emphasis Program shall be described described and may be limited by geographic boundaries, size of worksite, or similar considerations.

**3** National or local pilot programs may also be established under Special Emphasis Programs. Such programs may be conducted for the purpose of assessing the actual extent of suspected or potential hazards, determining the feasibility of new or experimental compliance procedures, or for any other legitimate reason.

(b) **Scheduling Inspections**. The following guidelines shall apply in scheduling Special Emphasis Program inspections:

**1** Certain Special Emphasis Programs identify the specific worksites and/or industries that will be inspected; therefore, the only action remaining to be taken is the scheduling of inspections.

**2** Other Special Emphasis Programs identify only the subject matter of the program and contemplate that not all worksites within the program will necessarily be inspected.

B. 1. b. (4) (b) **3** If no special worksites are identified

within the program, the Regional Administrator or the Area Director shall use available information to compile a worksite list.

**4** Where no procedures for scheduling worksites for inspection are specified by the National Office, the Regional Administrator or the Area Director, the selection procedures should be random using the method set forth in Appendix C. Other selection procedures shall be submitted for approval to the Director of Field Operations through the Regional Administrator.

(c) **Program Evaluation**. Agency policy currently requires the Regional Administrator to evaluate any special emphasis program approved for inspection within the Region. This evaluation shall consist of a report of the program's successes and difficulties in accomplishing its identified goals. Every program submitted for approval shall contain a program evaluation element.

(5) **Other Special Programs**. The Agency may develop programs to cover special categories of inspections which are not covered under the planning guide or under Special Emphasis Programs. Currently migrant farmworker camp inspections have been designated as such a program.

(a) OSHA has agreed to conduct migrant farmworker camp inspections annually, the number to be assigned by the Assistant Secretary in accordance with current program plan procedures. These inspections are to be distributed among the Regions in accordance with traditional levels of such activity. (See Chapter XI of OSHA Instruction CPL 2.45B)

(b) At the beginning of each season, the Regional Administrators for the Employment Standards Administration (ESA) will provide each Regional Administrator with a list of migrant farm worker camps which ESA does not intend to inspect.

**1** The list will contain all known migrant camps except the ones to be inspected by ESA.

**2** The list will also contain all known migrant camps not subject to ESA inspection because they do not have farm labor contractors associated with them.

(c) When the list is received, the Regional Administrator shall determine what procedure is to be used for scheduling migrant camp inspections. These inspections may be scheduled either by the the Regional Office or by the Area Office. If the scheduling is to be done by the Area Office, the list received from ESA shall be subdivided by geographical area and forwarded to the appropriate Area Office as soon as possible.

(d) The Regional Administrator is responsible, under either scheduling procedure, for ensuring that the minimum number of inspections mandated for the Region is accomplished. Area Offices may be assigned a proportional number of the inspections for which the Region is responsible or some other equitable distribution procedure may be used.

B. 1. b. (5) (e) The office responsible for scheduling these

inspections shall proceed as follows:

**1** Add to the ESA list (if one is recieved) all additional known migrant camps, using all available information, including OSHA inspection history, local knowledge and experience, and information from other relevant sources. This list shall be reviewed and revised as necessary each year.

**2** Delete any camps known to be inactive from past experience or from other reliable sources from the list referred to in the preceding subparagraph.

**3** If the total number of camps on the list is equal to or less than the number of inspections to be conducted, all of the camps shall be scheduled for inspection.

**4** If the total number of camps exceeds the number of inspections to be conducted, number the adjusted list consecutively beginning with 1.

**5** Using a random number method and following the guidelines in Appendix C, select farm worker camp sites in the order prescribed by the random numbers until the number of camps selected equals the number of projected inspections for the year. The resulting list shall constitute the annual cycle.

**6** If the Regional Office has scheduled the inspections for the whole Region, the list shall be subdivided and assigned to the appropriate Area Offices for inspection.

**7** Camps on the list for inspection may be selected and inspected in any order that makes efficient use of available resources.

**8** The inspection cycle shall be completed before the end of the current growing season. The only exceptions are as follows:

**a** An establishment may be carried over to the next cycle (next growing season) if substantially all activity has been completed at the site where the migrant camp is located and the camp itself has been vacated before the inspection could be conducted.

**b** An establishment may be carried over to the next cycle if the inspection cannot be completed due to the employer's refusal to allow it and there is not enough time to obtain a warrant.

B. 1. b. (5) (e) **8 c** Approval for carrying over a

worksite for reasons not listed above must be requested from the Regional Administrator and approved by the Director, Office of Field Programs.

**9** As the cycle progresses, each time a camp is deleted as not inspectable or is carried over to the next cycle (year) for some legitimate reason, another camp shall be immediately selected from the migrant camp list in the order prescribed by the random numbers and added to the inspection list until the number of inspections conducted equals the number of inspections needed to meet the total number projected for the Area (Regional) Office or until the list of known migrant camps is exhausted.

C. **Exemptions and Limitations.**

1. Congress may place exemptions and limitations on OSHA activities through the annual Appropriations Act. Refer to current OSHA Instructions for guidelines on how to apply current exemptions and limitations to compliance programming. (See OSHA Instruction CPL 2.51H., or most current version, and memorandum dated June 1994 with new appendixes.)

2. New construction activities within DOE sites will no longer be considered part of OSHA's jurisdiction. When such sites appear on targeting lists, they shall be deleted. If inspections are underway at such sites, they shall be terminated with appropriate explanations to the employer and to employee representative. Complaints from employees at such sites shall be referred to the DOE for resolution. See CPL 2.95, Enforcement Authority at the Department of Energy's (DOE) Government-Owned, Contractor-Operated (GOCO) Sites, February 10, 1992.

APPENDIX A

HEALTH INSPECTION PLAN

OSHA establishes priority for industries in scheduling programmed General Industry health inspections on the basis of the previous inspection experience of the industry. The agency assumes that industries for which OSHA has found a high number of serious, willful and repeat health violations in the establishments that were inspected have the greatest potential for health problems in those establishments not inspected. The agency uses violations data from all inspection types except follow-up inspections. Since the majority of OSHA's inspections are not programmed, the system is not inbred and most of the data used are the results of unprogrammed inspections.

The basis for the health inspection plan is from OSHA's previous inspection experience as recorded in the Integrated Management Information System (IMIS). Industries are selected by 4-digit Standard Industrial Classification (SIC) code on the basis of the average number of serious health violations found during the previous 5 years of OSHA health inspections of that industry. A ratio is calculated for all industries of the number of serious, repeat and willful health violations found to the number of inspections conducted within that industry from January 1989 through December 1993. Industries are then ranked in accordance with the ratios calculated, beginning with the highest ratio. The ranking is a national ranking; and, consequently, each State will receive a list of all industries operating within that State in the same rank order as on the national list. Data from over 30,000 inspections produce data on all of the 1,000 4-digit SICs that are used to classify industry in the private sector.

Once the industry priorities are established, an Industry Rank Report for health (Health SIC list) is generated, and a commercially available employer mailing list obtained from Duns & Bradstreet is used to identify all the establishments (with more than 10 employees) belonging to

these industries (Health Establishment List). Establishments are listed separately by Area/District Office jurisdiction. For each office all the establishments within the top 200 industries are randomly ordered and placed into four sublists which can be downloaded from the host computer to the micro.

The establishments are placed in random order using the following procedure. Each establishment in the top 200 industries is assigned a random decimal number between 0 and 1. Establishments in industries ranked 1 to 100 are given two random numbers with the larger number selected and assigned to the establishment. The list is sorted from largest to smallest random number. The resulting establishment list is in random order with the establishments in industries in the top 100 given two chances to place high on the list. To provide compatibility with the planning guide software, the rank value will be use at the micro for the random ordering of the establishment list. In the past the rank value has been used to provide a reference to the Industry rank report. The software uses the rank value to provide the order in which establishment are selected. Since rank is allowed only three digits on the micro computers, those area offices with more than 999 firms on their establishment lists will have up to three firms showing with the same rank. The planning guide software will randomly select when there are firms of the same rank and not all are selected.

Two reports are available. REPORT A-1 and REPORT A-2 contain a sample of each report with a detailed explanation. Report A-1 is the health industry list and lists the top 200 industries by 4-digit SIC codes by State (including all top 200 SIC codes, even those without establishments within the Area/District Office boundaries). The health industry list is sent to each office in SIC order and in rank order. Report A-2 lists the violations most frequently cited for each of the top 200 ranked industries. This report is available on request from the Office of Statistics.

NOTE: REPORT A-1, as in this appendix, contains phony data and is releasable. REPORT A-1 with data for each state is for OSHA use only. Each state report shall be considered confidential and non-disclosable in accordance with the prohibition against advance notice as contained in Section 17(f) of the Act.

REPORT A-1

Target Health SIC List for (State Name)

For each State, the rank of the highest 200 industries is based on the number of serious health violations per inspection. REPORT A-1 contains all industries with or without identified establishments employing more than 10 employees within the State. The list is presented in two ways: in rank order and in SIC code order. Industries with the same average number of serious violations per inspection are assigned the same rank. Figure B-1 is a sample report with fictitious data as it would appear for the State of Texabama (the rank order has also been modified so as to protect the true ranking).

For each industry in the report, the following data are furnished:

**SIC Code** - Based on the 1987 SIC code manual and presented at the 4-digit level.

**INDUSTRY DESCRIPTION** - Short SIC code industry titles.

**RANK** - Rank of industry based on its number of serious violations per inspection, beginning with "1" for the industry with the highest serious health violation ratio.

The following data are supplied for industries having establishments within the State:

**SHV PER INSP** - Number of serious, willful, and repeat violations per inspection for the 5-year period of federal health inspection.

**WORKERS** - State industrial employment.

**FIRMS** - State number of firms in the industry.

**CUMULATIVE TOTALS** - Cumulative totals are provided for each industry for the employment and number of firms. The cumulative totals are the sum of the value for that industry and all other industries with a higher rank.

(For Report A-1 Table, see printed copy)

Report A-2

Most Frequently Cited Health Standards by Industry

For each industry listed in Report A-1, Report A-2 lists the health standards cited during inspections. Figure A-2 is a sample page from this report for SIC code 2022. The following data are furnished:

SIC Code and Industry Description - These description are based on the 1987 SIC Code Manual and are presented at the 4-digit level.

**STANDARD** - The 19-digit standard as it appears in the IMIS.

**TOTAL VIOLATIONS** - The number of times the standard was cited.

**TOTAL PENALTY** - The penalty dollars associated with that standard.

**SERIOUS VIOLATIONS** - The number of times the standard was cited serious, repeat, or willful.

**SERIOUS PENALTY** - The penalty dollars when cited serious, repeat, or willful.

10/28/94 OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION

MOST FREQUENTLY CITED HEALTH STANDARDS BY INDUSTRY

SIC 2022 CHEESE, NATURAL AND PROCESSED SIC 2022

TOTAL TOTAL SERIOUS SERIOUS

STANDARD VIOLATIONS PENALTY VIOLATIONS PENALTY _____

5A(1) 1 720 1 720 1904.002 A 8 15,550 1 15,000 1904.002 B02 2 1904.004 1 5,000 1904.005 B 1 1904.005 C 1 1910.020 G01 1 4 12,500 1 12,500 1910.020 G01 II 4 1 1910.020 G01 III 4 1 1910.020 G02 3 1910.094 D09 1 1 640 1 640 1910.095 D01 1 480 1 480 1910.095 C01 1 1 1910.095 D01 1 1910.106 E02 IVD 1 360 1 360 1910.106 E06 II 1 1 1910.120 L01 1 1 720 1 720 1910.120 Q01 2 1,100 2 1,100 1910.132 A 2 980 2 980 1910.133 A01 1 1 1910.134 A02 1 1,000 1910.134 B01 1 1910.134 B05 1 1910.134 B07 1 1910.134 B10 2 640 1 640 1910.134 E01 1 300 1 300 1910.134 E02 1 1 1910.134 E03 3 1,250 3 1,250 1910.134 E03 III 1 1 1910.134 E05 1 1 1910.134 E05 I 1 1 1910.134 F01 4 940 3 940 1910.134 F02 1 2 210 1 210 1910.134 F02 II 1 1 1910.134 F02 III 1 1910.151 C 7 4,995 7 4,995 1910.252 A02 IID 1 1910.252 A02 IVA 1 1910.1000 A02 2 4,500 1 4,500 1910.1000 A03 1 1 1910.1000 E 1 1910.1000 F02 1 1 4,500 1 4,500 1910.1000 F03 I 1 1 1910.1001 M05 II 1 1910.1200 E01 6 1,030 3 1,030 1910.1200 E01 1 3 2,500 1 2,500 1910.1200 E01 II 1 1,100 1 1,100 1910.1200 F05 1 7 2,780 5 2,780 1910.1200 F05 II 6 4 1910.1200 G01 3 3,375 3 3,375 1910.1200 H 4 1,800 4 1,800 1910.1200 H01 1 1 1910.1200 H02 1 1 4,500 1 4,500 1910.1200 H02 II 2 600 2 600 1910.1200 H02 III 2 2

_____

SIC TOTAL 115 74,070 68 67,520

APPENDIX B

GENERAL INDUSTRY SAFETY INSPECTION PLANNING

The planning of General Industry safety inspections is based Lost Workday Injury and Illness (LWDC) rates for calendar year 1992 as provide for the nation by the Bureau of Labor Statistics. LWDC stands for Lost Work Day Cases either injury or illness. The information is presented in report form lists industries in rank order beginning with the industry with the highest LWDC rate. Only the Top 200 industries are included in the reports. All industries with an LWDC rate of 3.9 or greater per 100 full-time employees are considered high rate industries. However, the top 200 industries are used because in these 200 industries there are more establishments that can be used by most Area Offices. The rate of 3.9 is the national average LWDC rate for the private sector as published by the Bureau of Labor Statistics (BLS) for calendar year 1992. In this way, OSHA is able to maximize the utilization of available resources by targeting establishments in the Top 200 industries for programmed (planned) inspections. Report B-1 consists of a lists of the top 200 high rate industries with or without establishments located in the State.

The establishments are placed in random order at the host using the following procedure. Each establishment in the top 200 industries is assigned a random decimal number between 0 and 1. Establishments in industries ranked 1 to 100 are given two random numbers with the larger number selected and assigned to the establishment. The list is sorted from largest to smallest random number. The resulting establishment list is in random order with the establishments in industries in the top 100 given two chances to place high on the list. For the purpose of down loading the appropriate number of establishments for each office. The list for each office is divided into four sublists each containing about one quarter of the firms on the list.

To provide compatibility with the planning guide software, the rank value will be use for the random ordering of the establishment list. In the past the rank value has been used to provide a reference to the Industry rank report. The software uses the rank value to provide the order in which establishments are selected. Since rank is allowed only three digits on the micro computers, those area offices with more than 999 establishments on their establishment list will have up to three firms showing with the same rank. The planning guide software will randomly select when there are firms of the same rank and not all are selected.

NOTE: Most establishments with 10 or fewer employees have been removed from the lists. Report B-1, however, is a complete list of all ranked SIC codes irrespective of whether or not there are any targeted establishments within a listed industry to be found within the State.

The industry LWDC rates are based on the latest available national BLS injury and illness rates obtained from the annual survey for 1992. Statewide High Rate SIC List (Report B-1) is generated using national BLS data and statewide establishment and worker data. Establishments within each industry are obtained from a commercially available establishment mailing list. OSHA obtains the establishment list from Duns & Bradstreet to identify all the establishments belonging to these industries. These establishments are supplied electronically to the Area Office with jurisdiction.

NOTE: REPORT B-1, as in this appendix, contains phony data and is releasable. Report B-1 with data for each state is for OSHA use only. Each state report shall be considered confidential and non-disclosable in accordance with the prohibition against advance notice as contained in Section 17(f) of the Act.

Report B-1

High Rate Safety SIC List for (State Name)

For each State, the rank of all high rate industries is given in descending order beginning with the industry with the highest Lost Workday Injury and Illness (LWDC) rate. Report B-1 contains all industries with or without identified establishments employing more than 10 employees within the State. The list is presented in two ways: in rank order and in SIC code order. Industries with the same lost workday injury and illness rate are assigned the same rank. Only manufacturing industries are used in the selection process. Figure B-1 is a sample with fictitious data as it would appear in the report for the State of Texabama.

For each industry in the report, the following data are furnished:

SIC CODE - Based on the 1987 SIC code manual and presented at the 4-digit SIC level.

INDUSTRY DESCRIPTION - Short SIC code industry titles.

RANK - Sequential numbers assigned in the report, beginning with "1" for the industry with the highest LWDC rate.

LOST WORKDAY INJ/ILL - National LWDC rate as determined by the latest available BLS Survey, 1992.

WORKERS - Total number of employees in the industry for firms with 11 or more employees and smaller worksites related to larger firms.

FIRMS - Total number of establishments in the industry with 11 or more employees and smaller locations related to larger firms..

CUMULATIVE TOTALS - Cumulative totals are provided for each industry in a State for the number of employees and number of establishments. The last ranked industry in the State contains the respective totals for the State.

(For Report B-1 Table, see printed copy)

APPENDIX C

RANDOM NUMBER LISTS

The three lists of random numbers provided are designed to order randomly a list of firms which contains 1,000 or fewer firms. A larger list of random numbers will be supplied upon request. For purposes of random selection, the attached random number lists may be used or any other authentic random number list available to the Area Office.

The following tables have been produced by ordering the integers from 1 to 1,000 randomly and displaying the results in three lists corresponding to establishment list size.

**LIST ONE** - 100 numbers: the integers from 1 to 100 listed in five columns.

**LIST TWO** - 500 numbers: the integers from 1 to 500 listed in nine columns.

**LIST THREE** - 1,000 numbers: the integers from 1 to 1,000 listed in 18 columns.

The procedure to be used is as follows:

1. Make all modifications to the establishment list.

2. Number the establishment list sequentially; i.e., assign "1" to the first firm on the list, "2" to the second, etc.

3. Select the smallest random number table with more numbers than firms on the establishment list; e.g., for 110 firms, select list two.

4. Cross out all numbers on the random number list that has been selected which are greater than the number of firms on the establishment list.

5. Include all firms in the inspection cycle whose sequence number is listed in column I. If the size is larger than the size of column I, start at the top of column II and select enough numbers to fill out the inspection cycle.

6. Draw a line after the last random number used; this will be the starting point for the next inspection cycle.

EXAMPLE: Suppose there are 70 firms on the establishment list and an inspection cycle containing 12 firms is needed. Random number list one is selected and all numbers greater than 70 are crossed out. The first inspection cycle would then contain firms with the following sequence numbers: 64, 18, 16, 22, 47, 14, 39, 51, 38, 67, 24 and 1. Draw a line under the number 1 and start the next cycle with the numbers 5, 33, 11 on down Column II.

Random Number Table

List One

100 Numbers

Column Column Column Column Column

I II III IV V

94 98 89 20 83 64 97 80 57 58 18 33 15 65 41 90 11 45 25 93 92 52 85 54 46.16 40 84 6 26 74 75 49 71 87 22
37 13 44 62 47 72 29 70 21 14 82 19 48 30 100 63 8 78 34 39 35 73 88 23 77 56 55 9 28 86 69 2 60 99 51 79
32 43 7 38 42 81 95 59 67 12 96 91 3 24 68 31 53 66 1 61 27 17 36 5 76 50 10 4

Prepared by the Office of Statistics,

October 11, 1994

(For Random Number Table List Three, 500 Numbers, see printed copy)

(For Random Number Table List Three, 1000 Numbers, see printed copy)

⇐ Directives - Table of Contents

Freedom of Information Act | Privacy & Security Statement | Disclaimers | Important Web Site Notices | International | Contact Us

U.S. Department of Labor | Occupational Safety & Health Administration | 200 Constitution Ave., NW, Washington, DC 20210
Telephone: 800-321-OSHA (6742) | TTY: 877-889-5627
www.OSHA.gov